Michael MORRILL, Ben Price, Kurt Shotko, Guy Anthony and Eric Prindle, Plaintiffs,

v.

C. Michael WEAVER, in his official capacity as Secretary of State of Pennsylvania, and Richard Filling, in his official capacity as the Commissioner overseeing Pennsylvania's Bureau of Commission, Elections and Legislation, Defendants.

No. CIV.A. 02–CV–1497.

United States District Court
E.D. Pennsylvania.

April 19, 2002.

Jeffrey Istvan, Fine, Kaplan and Black, Philadelphia, PA, Nancy Northup, Glenn J. Moramarco, NYU School of Law, New York City, Elizabeth Daniel, New York City for Plaintiff.

John O.J. Shellenberger, III Official Capacity as Secretary of State of Pennsylvania, Randall J. Henzes, Office of Attorney General, Philadelphia, PA, for Defendant.

Mark B. Cohen, PA House of Representatives, Harrisburg, PA, for Mark B. Cohen.

## OPINION AND ORDER

Van Antwerpen, District Judge.

This case concerns a constitutional challenge brought on March 25, 2002 by five Green Party candidates and activists ("Plaintiffs"), requesting a preliminary injunction restraining enforcement of a Commonwealth of Pennsylvania statute, 25 P.S. § 2911(d) (" § 2911(d)" or "the statute"), regarding nominations of candidates for political office. The statute requires that election petition "affiants" for a particular candidate be "qualified electors" of the district in which that candidate is running. Plaintiffs allege that if "qualified electors" must be registered voters living in particular electoral districts, then § 2911(d) violates their rights to free expression and association under the First and Fourteenth Amendments to the United States Constitution.[1]

---

1. We are aware that elsewhere in Pennsylvania, the Commonwealth is undergoing litigation regarding its new redistricting plan, after its previous plan was struck down in *Vieth v. Pennsylvania*, 2002 WL 530870 (M.D.Pa. April 8, 2002). Considerable media attention surrounds the redistricting adjudication. We state for clarity's sake that the case we now decide has no bearing on redistricting.

The parties agreed in a telephonic conference on March 27, 2002 that they would rest on their pleadings so that the trial on the merits could be consolidated with the preliminary injunction hearing, inasmuch as there were no factual issues in dispute—only legal questions. Accordingly, the parties were notified by our March 28, 2002 order that under Fed.R.Civ.P. 65(a)(2), the trial on the merits would be advanced and joined with the hearing before us on April 10, 2002. Thus, the initial request for a preliminary injunction became a hearing on the merits of a permanent injunction. On April 18, 2002, we received an amicus curiae brief from Mark B. Cohen, Esq., a longtime Pennsylvania legislator and Chairman of the Democratic Caucus.

In consideration of all the evidence and arguments before us, we will now grant a permanent injunction against enforcement of certain provisions of 25 P.S. § 2911(d), which we find unconstitutionally restrain the freedom of political expression and association of the plaintiff candidates and activists, among others.

If the Commonwealth defines "qualified electors" who are permitted to verify election petition signatures such that the phrase includes only registered voters, then the statute is clearly unconstitutional under *Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 119 S.Ct. 636, 142 L.Ed.2d 599 (1999). Although lower state courts have construed the phrase "qualified electors" in other contexts, *see,* e.g., *In re: Nomination Paper of Cooper,* 102 Pa.Cmwlth. 133, 516 A.2d 1285 (1984) ("qualified electors" signing a petition must be registered voters), the Pennsylvania Supreme Court has not specifically limited the phrase to apply to registered voters. We believe the Pennsylvania Supreme Court would attempt to give 25 P.S. § 2911(d) a constitutional construction, and hold that the term "qualified electors" applies to all residents of a particular electoral district.

Nonetheless, even if we define the phrase "qualified electors" to include all residents of an electoral district, we believe that 25 P.S. § 2911(d) unduly infringes upon the Plaintiffs' and others' First Amendment free speech and free association rights, which strongly protect political activity. We find that the Commonwealth has articulated no compelling or sufficient reason for requiring election petition "affiants" to be residents of a specific district, as opposed to residents of the Commonwealth at-large.

Our decision to restrain enforcement of provisions of 25 P.S. § 2911(d) dictates that "affiants" to elections petitions need not be registered voters and may reside anywhere in the Commonwealth.[2] The Commonwealth must also pay Plaintiffs' fees and costs associated with this litigation to vindicate their constitutional rights.

## I. BACKGROUND

The Plaintiffs are Green Party candidates and activists. Michael Morrill is the Green Party's 2002 gubernatorial candidate. Ben Price is the Green Party's 2002 candidate for the U.S. House of Representatives in the 19th congressional district. Kurt Shotko aspires to be the Green Party's U.S. congressional candidate in the 10th district. Guy Anthony is the Green Party's candidate for state representative in the 144th district. Eric Prindle is a Green Party activist and the Field Director for Morrill for Governor.

---

**2.** We decline to decide whether nominating petition affiants may be out-of-state residents.

*See infra* Section V.B.3.

Because the Green Party is considered a minor political party in Pennsylvania under 25 P.S. §§ 2831 and 2872.2,[3] it does not hold primary elections. Instead, its candidates are only nominated by obtaining signatures on "nomination papers." 25 P.S. §§ 2872.2(a), 2911. The Commonwealth explains, "For statewide offices, the candidate must obtain [a number of signatures equal to] at least two percent of the largest number of votes cast for any elected candidate in the state at large at the last preceding [statewide] election." 25 P.S. § 2911(b), cited in Def. Memo., pp. 2–3. "For non-statewide offices, the candidate must obtain at least two percent of the largest number of votes cast for any officer (except a judge) elected in the election district where the nomination is sought in the last preceding election." *Id.* The parties agree that before August 1, 2002, Morrill needs to obtain more than 21,000 signatures to become a candidate for governor, while Price and Shotko need approximately 3,000 signatures and Anthony needs approximately 300 signatures. Def. Memo., p. 3; Pl. Prelim. Statement, pp. 2–4.

The challenged statute, 25 P.S. § 2911(d), a provision of the Pennsylvania Election Code concerning the nomination of candidates, reads as follows:

Nomination papers may be on one or more sheets and different sheets must be used for signers resident in different counties. . . . Each sheet shall have appended thereto the affidavit of some person, not necessarily a signer, and not necessarily the same person on each sheet, setting forth—(1) *that the affiant is a qualified elector of the State, or of the electoral district, as the case may be, referred to in the nomination paper;* (2) his residence, giving city, borough or township with street and number, if any; (3) that the signers signed with full knowledge of the contents of the nomination paper; (4) that their respective residences are correctly stated therein; (5) that they all reside in the county named in the affidavit; (6) that each signed on the date set opposite his name; and (7) that, to the best of affiant's knowledge and belief, the signers are qualified electors of the State, or of the electoral district, as the case may be. (Emphasis supplied.)

The parties agreed at the hearing that under § 2911(d), Plaintiffs cannot affirm petition signatures for any candidates running in non-statewide elections outside the electoral districts where Plaintiffs respectively reside. Hearing Transcript, pp. 29–33. Though the Commonwealth emphasizes that technically, anyone may circulate petitions, Defendants acknowledge that under the statute as written, a "qualified elector" residing in the particular electoral district must be present to serve as an "affiant," verifying each signature collected by out-of-district circulators. *Id.*

Thus, under the statute, Morrill cannot affirm petition signatures for Green Party candidates for U.S. Congress, the state legislature or other down-ballot regional or local positions outside his own electoral district. After redistricting,[4] Price and

3. Under § 2872.2(a), a "minor political party" is one "whose State-wide registration is less than fifteen per centum of the combined State-wide registration for all State-wide political parties as of the close of the registration period immediately preceding the most recent November election." According to the Commonwealth's data, the Green Party counts among its members approximately 3,200 of 7,775,000 registered voters in Pennsylvania (approximately 0.04% of those registered). Def. Memo., pp. 2,8, Ex. A.

4. Recently, the redistricting plan has been judicially overturned. *Vieth*, 2002 WL 530870. The parties await a new plan. We believe that regardless of the outcome, Plaintiffs' claims are "capable of repetition, yet evading review," and therefore not moot. *See infra* Section III, regarding justiciability.

Shotko claim to reside outside the geographic boundaries of the congressional districts where they respectively seek office.[5] If they reside outside their districts, then the parties agree that Price and Shotko could not affirm signatures on their own nominating petitions. Likewise, Anthony cannot use volunteers from outside his legislative district to collect signatures for his petition, unless such volunteers are accompanied by "qualified electors" from within the district, who may affirm the validity of any signatures collected. Prindle, the Green Party activist, may not create a team of Green Party members to traverse the state collecting nominating petition signatures for a slate of candidates, unless the team is accompanied in each district by a local "affiant" overseeing and certifying the veracity of each signature.[6]

On March 25, 2002, the Plaintiffs filed a Motion for a Preliminary Injunction asking that we declare portions of 25 P.S. § 2911(d) unconstitutional and that we enjoin enforcement of such provisions, granting appropriate relief and awarding Plaintiffs costs and fees.[7] Plaintiffs stated without dispute in a telephonic conference on March 27, 2002 that this case was inappropriate for a three-judge panel, and that our court had jurisdiction to decide on the application for injunction. Telephone Conference Transcript, pp. 6–7. The parties also agreed that they would rest on their pleadings so that the trial on the merits could be consolidated with the preliminary injunction hearing, inasmuch as there were no factual issues in dispute—only legal

questions. *Id.* at 15–17; Hearing Transcript, pp. 2–3. Accordingly, the parties were notified by our March 28, 2002 order that under Fed.R.Civ.P. 65(a)(2), the trial on the merits would be advanced and consolidated with the hearing before us on April 10, 2002. Defendants filed their response on April 8, 2002 and we heard oral argument from Plaintiffs and the Attorney General's representatives on April 10, 2002. On that date, we also granted Mark B. Cohen, Esquire's motion to file an amicus brief. We received the amicus brief on April 18, 2002.

## II. JURISDICTION

Plaintiffs raise constitutional questions as to the validity of a Pennsylvania statute. Generally, constitutional questions fall within our original jurisdiction under 28 U.S.C. § 1331. Under 28 U.S.C. § 2281, a preliminary or permanent injunction restraining the enforcement, operation or execution of a State statute on grounds of unconstitutionality could not be granted unless the application had been heard and determined by a three-judge court. *See* decisions applying § 2281, e.g., *Hicks v. Pleasure House, Inc.*, 404 U.S. 1, 92 S.Ct. 5, 30 L.Ed.2d 1 (1971); *Idlewild Bon Voyage Liquor Corporation v. Epstein*, 370 U.S. 713, 82 S.Ct. 1294, 8 L.Ed.2d 794 (1962); *Stratton v. St. Louis Southwestern Ry. Co.*, 282 U.S. 10, 51 S.Ct. 8, 75 L.Ed. 135 (1930). Section 2281 was repealed by Congress in 1976 in P.L. 94–381 (S 537), legislation designed to "improve judicial machinery by amending the requirement for a three-judge court in certain cases"

---

**5.** *See infra* Footnote 9 regarding qualifications for the U.S. Congress.

**6.** Slate petitions are authorized by § 2911(c), which states in relevant part, "More than one candidate may be nominated by one nomination paper and candidates for more than one office may be nominated by one nomination paper."

**7.** Plaintiffs' Prayer for Relief also requested "damages for the extra and unnecessary costs incurred by them in complying with and planning to comply with 25 P.S. 2911(d)" (Pl.Prelim.Statement, p. 11), but Plaintiffs abandoned this claim at the hearing on April 10, 2002. Hearing Transcript, pp. 41–42.

such that fewer cases required such panels. P.L. 94–381 Notes. Congress considered "unwieldy" the requirement of a three-judge court in all cases concerning the constitutionality of state statutes. *Merrill v. Town of Addison,* 763 F.2d 80, 82 (2nd Cir.1985), citing S.Rep. No. 204, 94th Cong.2d Sess. 13, *reprinted in,* 1976 U.S.Code Cong. & Ad. News, 1988, 2001. Congress' action negated portions of *Hicks, Idlewild, Stratton* and other decisions invoking § 2281.

■ Under P.L. 94–381, 28 U.S.C. § 2284 was amended such that today, a three-judge court is only required upon hearing a constitutional challenge to "the apportionment of congressional districts or the apportionment of any statewide legislative body" or where otherwise required by an Act of Congress. Single district judges again have jurisdiction over suits to enjoin state statutes on constitutional grounds. *LaRouche v. Fowler,* 152 F.3d 974, 981 (D.C.Cir.1998). Thus, we consider a constitutional challenge to § 2911(d) without a three-judge panel, applying P.L. 94–381.[8]

### III. JUSTICIABILITY

■ Under Article III of the Constitution, a federal court may exercise jurisdiction only where there is an actual case or controversy to be decided. *Golden v. Zwickler,* 394 U.S. 103, 108, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). We must assess whether the situation before us is one "of sufficient immediacy and reality" to warrant the issuance of declaratory judgment and an injunction. *Maryland Casualty Co. v. Pacific Coal and Oil Co.,* 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941).

■ At the hearing on April 10, 2002, the Commonwealth repeatedly asserted

that Plaintiffs' claims remain unripe for our consideration, inasmuch as the Pennsylvania Secretary of State has not yet excluded any candidates from the 2002 ballot for failure to obtain adequately-affirmed signatures. *See,* e.g., Hearing Transcript, p. 35. The Commonwealth argued: "These individuals could go about their business and ... collect the required number of signatures from anybody in the United States or the world.... The Secretary of State may miss it. I'm not saying he should or he shouldn't. Someone may come in and object [to signatures] like they did in" cases from other Circuits, and the State could invalidate petition signatures based on such objections. Hearing Transcript, pp. 16, 22. At this point, the case would presumably ripen, in the Commonwealth's view. *Id.* The Commonwealth concluded that thus far there is no "injury to [the candidates'] ability to run for office." *Id.* at 35.

The Commonwealth seems to invoke the principle that plaintiffs challenging the validity of a state statute may bring suit against the officials charged with the statute's enforcement "only if the official[s] ha[ve] either enforced, or threatened to enforce, the statute against the plaintiffs." *Rode v. Dellarciprete,* 845 F.2d 1195, 1209 (3d Cir.1988).

Plaintiffs' counsel responded at the April 10, 2002 hearing as follows:

[The Commonwealth is] suggesting ... that we should ... instruct our circulators to violate the oath they take and maybe they'll get away with it. There is a line at the bottom of those petitions that requires circulators to state .... that they are qualified electors for the district or state—what-

---

**8.** When Congress passed P.L. 94–381, it also added 28 U.S.C. 2403(b), requiring that we notify a state Attorney General when the constitutionality of a state law is at issue. *See*

*Merrill,* 763 F.2d at 82–83. In this case, the Commonwealth's Attorney General has been adequately notified, and indeed, his Deputies have represented the Commonwealth.

ever it may be—for the candidate named there and we cannot in good conscience ask people, who do not reside in a district to circulate outside and hope that someone won't challenge them or prosecute them.... [I]t's possible they might get away with it, but we're here to find out what they can do legally.

And as the affidavits make clear, people have declined to be circulators now that it is clear ... that they cannot engage in it consistent with what the law requires. Hearing Transcript, pp. 35–36.

The Plaintiffs' argument recalls the rule of *Turner v. Fouche*, 396 U.S. 346, 362, 90 S.Ct. 532, 24 L.Ed.2d 567, 396 U.S. 346, 90 S.Ct. 532, 24 L.Ed.2d 567 (1970), that a State "can hardly urge that her county officials may be depended on to ignore a provision of state law." Plaintiffs need not "wait for the axe to fall" on them. *Berger v. Heckler*, 771 F.2d 1556, 1563 (2nd Cir. 1985). Moreover, they allege they are already altering their activity—refraining from particular political speech and organization—to conform to the allegedly unconstitutional statutory scheme. *See Pierce v. Society of the Sisters*, 268 U.S. 510, 45 S.Ct. 571, 69 L.Ed. 1070 (1925); *Zielasko v. State of Ohio*, 873 F.2d 957, 958 (6th Cir.1989).

Thus, weighing the parties' arguments, we must determine if there exists an imminent likelihood of constitutional violation based on the Commonwealth's enforcement of § 2911(d) and/or a shift in Plaintiffs' activity in anticipation of such violation, or if the alleged danger is as the Commonwealth describes it: merely speculative.

The Commonwealth is uncertain whether or not it would enforce the requirement in § 2911(d) that nominating petition affiants be "qualified electors" such that the term would exclude residents not registered to vote. Hearing Transcript, pp. 14–15. If construing "qualified electors" to include registered voters were the only basis for the Plaintiffs' suit, then we might find that the Plaintiffs' suit was unripe, because there remains a serious possibility that the Commonwealth would not attempt to impose such a construction upon § 2911(d). In other words, a case or controversy might never arise solely based on candidates' petitions affirmed by unregistered individuals within particular electoral districts.

On the other hand, the Commonwealth acknowledges that under § 2911(d), it would seek to exclude petition signatures affirmed by individuals residing outside the electoral districts to which such signatures pertain. *See,* e.g., Hearing Transcript, pp. 32–33. The Commonwealth raises the possibility that the Secretary of State might overlook enforcement of § 2911(d) in a particular case if a challenge to the signatures were never raised by an opposing candidate. *Id.* at 16–17. However, the Commonwealth does not dispute the fact that it would consider such signatures legally invalid and would reject them upon receiving a challenge. *Id.* at 19–20.

Plaintiffs adequately establish in their declarations, which are factually undisputed by the Commonwealth, that Plaintiffs are now straying from their preferred course of conduct to conform with § 2911(d). Naturally, the Green Party does not wish to risk having its candidates disqualified at a later stage in the electoral process because of inadequate signature collection in the early phases of the campaign. In compliance with § 2911(d), Plaintiffs testify that they are currently: refraining from their plans to travel the State obtaining signatures on Green Party candidates' petitions; refraining from plans to circulate authorized slate petitions, in which individuals sign supporting the candidacy of the gubernatorial candidate, Morrill, along with local Green Party

candidates; devoting an undue amount of campaign time to signature gathering while turning down offers of assistance in signature gathering from family members and close supporters living outside particular electoral districts; and working to collect an excessive number of signatures, because of their palpable fear of having many signatures invalidated. *See* Pl. Motion, Ex. A–E.

We believe these facts suggest a conclusion like the Supreme Court's in *Society of the Sisters,* in which the Court restrained Oregon's Compulsory Education Act, which would have required all Oregon children between certain ages to attend public schools. *Society of the Sisters,* 268 U.S. at 529–532, 45 S.Ct. 571. Though the effective date of the statute had not yet arrived, the Court granted the injunction requested by the organization administering a private school because the Act had "already caused the withdrawal from its schools of children who would otherwise continue, and [the private school's] income has steadily declined. The appellants, public officers, [had] proclaimed their purpose strictly to enforce the statute." *Id.* at 532, 45 S.Ct. 571. The Court concluded, "Prevention of impending injury by unlawful action is a wellrecognized function of courts of equity." *Id.* at 536, 45 S.Ct. 571.[9]

Likewise, in the case at bar, as we have noted, the Plaintiffs are already losing valuable campaign time and declining offers from would-be volunteers because of § 2911(d), and the Commonwealth maintains that it would strike signatures affirmed by individuals residing outside particular electoral districts where such signatures are challenged.

■ Price and Shotko have been particularly burdened, because they have not been able to collect signatures for their own petitions, since their residences are outside the recently-redrawn congressional districts in which they are running for office. Pl. Motion, Ex. B, C. Though the redistricting plan was recently invalidated (*see Vieth,* 2002 WL 530870) and it is possible that these particular concerns of Price and Shotko may be mooted, the scenario is "capable of repetition, yet evading review"—a recognized exception to the mootness doctrine. *Southern Pacific Terminal Co. v. Interstate Commerce Commission,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310. That is, we can easily envision future scenarios—possibly even in this election—in which these individuals could not affirm signatures on their own nominating petitions because of § 2911(d)'s in-district residency requirement for "qualified electors."[10] The need for resolution

---

9. For a general discussion of the *Society of the Sisters* rule, *see* 13A Fed. Prac. & Proc. Juris.2d § 3532.2, Wright & Miller Treatise, "Uncertain Contingencies." The treatise explains, "[C]ases recognize that it is enough to challenge a statute that the plaintiff is presently conforming to its requirements, or must arrange its affairs to conform. . . . Some . . . cases present particularly impressive claims that the very uncertainty whether a challenged regulation is valid may have a debilitating impact on planning for the future." *Id.*

10. As Price and Shotko observe, the qualifications for seats in the U.S. Congress do not include an in-district residency requirement. *See generally* the Qualifications Clause of the

Constitution, U.S. Const. Art. I, § 2, cl. 2; *U.S. Term Limits, Inc. v. Thornton,* 514 U.S. 779, 115 S.Ct. 1842, 131 L.Ed.2d 881 (1995) (states may not add additional qualifications to those set forth in the Constitution for positions in the U.S. Senate or Congress). We described this ironic scenario to the Commonwealth at the hearing on April 10, 2002— that Pennsylvania imposes greater requirements on its signature gatherers than on its congressional representatives. Counsel did not deny that Price and Shotko may run in those districts where they do not reside, but may not affirm petition signatures for their candidacies under § 2911(d). The Seventh Circuit noted a similar anomaly in striking down an Illinois in-district residency require-

of § 2911(d)'s constitutionality reflects a continuing controversy in the extent of individual liberties.

Furthermore, the Commonwealth does not dispute Plaintiffs' contention that many have had their candidacies nullified in past elections for failure to obtain an adequate number of "valid" signatures, including Plaintiff Shotko in multiple previous attempts to be listed on the ballot. With respect to such past, failed candidacies, though the individuals cannot lay claims to offices for which they were never able to· run, the Commonwealth's alleged unconstitutional enforcement of § 2911(d) again meets the "capable of repetition, yet evading review" standard. *See Moore v. Ogilvie,* 394 U.S. 814, 816, 89 S.Ct. 1493, 23 L.Ed.2d 1 (1969), citing *Southern Pacific Terminal Co.,* 219 U.S. at 515, 31 S.Ct. 279 ("[W]hile the 1968 election is over, . . . as long as Illinois maintains her present system as she has done since 1935 . . . [t]he problem is . . . 'capable of repetition, yet evading review.' "). Our abiding interest in the constitutionality of the elections process ( *Meyer v. Grant,* 486 U.S. 414, 425, 108 S.Ct. 1886, 100 L.Ed.2d 425 (1988)) cannot be negated by adjudging every case unripe before the election or moot after the election.

Moreover, the Commonwealth's Nomination Paper (a document marked, "DSBE 210MPP Department of State (Rev.1/02)") unambiguously requires that the affiant swear or affirm in the presence of a notary or person empowered to take legally-binding acknowledgments that the affiant to the petition signatures is a "qualified elector *of the electoral districts* referred to in this nomination paper," (emphasis supplied) stating an appropriate address. If Plaintiffs take oaths to being "qualified electors" outside particular electoral districts in which they reside, they will subject themselves to the possibility of prosecution for perjury. 25 P.S. § 3502.[11] Indeed, if they were convicted of perjury, a type of *crimen falsi,* they would be unfit to hold public office in Pennsylvania under the laws of the Commonwealth and could be subject to fines and imprisonment. *See,* e.g., *id.; Commonwealth ex rel. Baldwin v. Richard,* 561 Pa. 489, 751 A.2d 647, 652–653 (2000); *Bolus v. Fisher,* 785 A.2d 174, 178 (Pa. Cmwlth.2001); *In re Cicchetti,* 697 A.2d 297, 316 (Pa.Ct.Jud.Disc.1997).

In a similar situation, the Sixth Circuit in *Zielasko* found the plaintiffs asserted a justiciable case or controversy regarding a provision of an Ohio statute requiring that candidates for office be younger than 70— though the candidate, Zielasko, had not yet even formally declared his candidacy. *Zielasko,* 873 F.2d at 957. The Court explained:

> The form for the declaration of candidacy requires the candidate to state, among other things, that he or she is a qualified candidate for the office he or she is seeking. This declaration is made

---

ment for petition circulators. *See Krislov v. Rednour,* 226 F.3d 851, 856 FN1 (7th Cir. 2000).

**11.** Section 3502 of the Pennsylvania Election Code, concerning the penalties for perjury, states, "Any wilful false statement made under oath or affirmation or in writing, stating that it is so made, although such oath or affirmation may not have actually been made, by any person regarding any material matter or thing relating to any subject being investi-

gated, heard, determined or acted upon by any county board of elections, or member thereof, or by any court or judge thereof, judge of election, inspector of election, or overseer, in accordance with the terms of this act, shall be perjury, a misdemeanor of the first degree, and any person upon conviction thereof, shall be sentenced to pay a fine not exceeding ten thousand ($10,000) dollars, or to undergo an imprisonment of not more than five (5) years, or both, in the discretion of the court."

under the threat of criminal penalty for "election falsification." . . . . The district court . . . correctly found that because the Ohio Constitution contains an age requirement for judicial office, age must be considered a "qualification" for such office. Accordingly, the court concluded that by signing a declaration of candidacy Zielasko would be subject to the real and immediate (not merely conjectural or hypothetical) harm of criminal penalty. The fear of some certain legal penalty may constitute an actual harm or injury sufficient to save a case from dismissal where dismissal is sought on the ground that no actual case or controversy exists. *Zielasko*, 873 F.2d at 959, citing *Clements v. Fashing*, 457 U.S. 957, 961–62, 102 S.Ct. 2836, 2842–43, 73 L.Ed.2d 508 (1982).

*See accord Miyazawa v. City of Cincinnati*, 825 F.Supp. 816, 818 (S.D.Ohio 1993) ("Accordingly, fear of some certain legal penalty may constitute an actual harm or injury sufficient to save a case from dismissal where dismissal is sought on the ground that no actual case or controversy exists."). *See also Turner*, 396 U.S. at 362, 90 S.Ct. 532 (Georgia's requirement that a county's board of education officials meet a "freeholder requirement" had never excluded anyone from a particular county's board of education, but the African–American plaintiff's allegation that he was not a freeholder and could not be selected for the all-white board was nonetheless sufficient to make out a justiciable case or controversy).

Following *Zielasko. et. al.*, we find that but for their fear of violating the in-district residency requirement of § 2911(d)'s "qualified elector" definition, Plaintiffs would be circulating and affirming signatures on nominating petitions statewide. In order to challenge the provision, Plaintiffs need not commit the crime of perjury by swearing that they are "qualified electors"of particular districts, when in fact they are not, according to the statute as written and the Commonwealth's statements explaining § 2911(d) to this Court.

We find inapposite those cases which have held unripe the plaintiffs' actions seeking to enjoin a statute where the State itself was unlikely to enforce the unconstitutional statute. For example, we distinguish *1st Westco Corp. v. School Dist. of Philadelphia*, 6 F.3d 108 (3rd Cir.1993), concerning an action against certain Commonwealth officials which was dismissed because the allegedly unconstitutional statute was implemented directly by school districts; Pennsylvania officials did not personally have the authority to enforce it. Likewise, we distinguish *Rode*, 845 F.2d at 1208 (3rd Cir.1988) ("Here, there is no realistic potential that the Governor's general power to enforce the laws of the state would have been applied to a departmental regulation against a PSP administrative assistant.").

In the instant case, the Secretary of State of Pennsylvania regulates elections and, in conjunction with the Commonwealth's Attorney General, regularly enforces the challenged election law to exclude candidates who have not submitted adequate Nomination Papers.

The Fourth Circuit's decision in *Silverman v. Ellisor*, 940 F.2d 653 (Table) (4th Cir.1991) (unpublished, text in Westlaw) is also inapplicable to our situation. In *Silverman*, the plaintiffs sought declaratory and injunctive relief against "sections of the South Carolina Constitution which disqualify from public office persons who deny the existence of 'the Supreme Being.'" *Id.* at *1. The Court held that the suit was unripe because a candidate was not disqualified from running based on his lack of belief in "the Supreme Being,"and the State indicated "that it would have permitted Silverman to be on the ballot if he had otherwise qualified as a candidate."

*Id.* at *3. Moreover, the statute had never disqualified a candidate, so the question remained hypothetical. *Id.* at *4.

Unlike the situation in *Silverman,* the challenged provisions of § 2911(d) are not merely unenforced requirements which Plaintiffs have disinterred from the Commonwealth's Election Code graveyard for their suit requesting an injunction. On the contrary, the "qualified elector" standards are printed on every Nomination Paper currently in use across the Commonwealth. Candidates are regularly disqualified for failing to obtain adequate signatures. As we noted above, Plaintiff Shotko has himself been eliminated from the ballot several times in past elections for failing to garner sufficient signatures.

In sum, Plaintiffs' suit is ripe for our consideration. Plaintiffs are already significantly adjusting their behavior to comport with the Commonwealth's requirements. Their failure to do so could disqualify them from running for office or subject them to criminal prosecution for perjury—a choice no candidate must be forced to make before constitutionally challenging a provision of the election laws.

### III. PERMANENT INJUNCTION

Realizing the need for judicial efficiency, Fed.R.Civ.P. 65(a)(2) enabled us to order the advancement of a trial on the merits and its consolidation with the hearing on an application for a preliminary injunction. *See* Fed.R.Civ.P. 65(a)(2), Advisory Committee Notes,1966 Amendment. On March 27, 2002, the parties indicated on the record that they intended to rest on their pleadings, presenting no witnesses or additional evidence.[12] Telephone Conference Transcript, pp. 15–17; *see also* Hearing Transcript, pp. 2–3. On March 28, 2002, following the Supreme Court's guidance in *University of Texas v. Camenisch,* 451 U.S. 390, 395, 101 S.Ct. 1830, 68 L.Ed.2d 175 (1981), we gave the parties clear and unambiguous notice of our intention to consolidate the trial and the hearing, providing them with a full opportunity to present their cases in oral argument on April 10, 2002. At the hearing, the parties again acknowledged that the facts were predominantly undisputed and that our judgment concerning the relevant law would dictate the outcome. Hearing Transcript, pp. 2–3.

The requirements for granting a permanent injunction differ from the standards for granting a preliminary injunction. *American Civil Liberties Union of New Jersey v. Black Horse Pike Regional Bd. of Educ.,* 84 F.3d 1471, 1477 (3rd Cir.1996). We may grant a permanent injunction only when the Plaintiffs succeed on the merits of their claims, meeting their burden of proof. *Id.* at 1477. In this case, Plaintiffs must establish by a preponderance of the evidence that Pennsylvania's law violates their protected constitutional rights. We must also find that no available remedy at law exists,[13] and that the balance of the equities favors granting injunctive relief. *Ciba–Geigy Corp. v. Bolar Pharmaceutical Co.,* 747 F.2d 844, 850 (3rd Cir.1984), *cert. denied,* 471 U.S. 1137, 105 S.Ct. 2678, 86 L.Ed.2d 696 (1985).

On the other hand, under a preliminary injunction, Plaintiffs need not succeed in proving their case, but must show only that there is a *"likelihood* [of success] on

---

**12.** The parties' agreement to rest on their pleadings rendered inapplicable Fed.R.Civ.P. 65(a)(2)'s provision saving to the parties "any rights they may have to trial by jury" after the consolidated hearing. The parties effectively waived such rights.

**13.** Since Plaintiffs do not sue for damages (*see supra* Footnote 7) but to have us restrain portions of a State statute relevant to their current elections process, there is no adequate remedy at law.

the merits, [which] neither constitutes nor substitutes for an actual finding that plaintiffs have succeeded on the merits and are entitled to permanent relief." *Id.* (emphasis supplied). Here, we do not consider the factors for granting a preliminary injunction.[14] Rather, we determine whether a preponderance of the evidence indicates that the Plaintiffs' rights are being violated and the balance of equities favors an injunction, based upon the largely undisputed facts before us.

## V. CONSTITUTIONALITY OF 25 P.S. § 2911(d)

Plaintiffs claim that § 2911(d) violates their rights to free political expression and association under the First and Fourteenth Amendments to the United States Constitution. First, we must determine whether § 2911(d) requires that an affiant to nominating petition signatures, who must be a "qualified elector" under 25 P.S. § 2911(d), must be a registered voter. If so, we must decide whether Pennsylvania can demand that petition affiants be registered voters without offending the Constitution. Second, we must judge the constitutionality of 25 P.S. § 2911(d)'s requirement that nominating petition affiants be residents of the electoral districts in question.

A. Defining the Term "Qualified Elector" Without a Registration Requirement

Several lower state courts have held that the term "qualified elector" in 25 P.S. § 2911 concerning candidates' nominating petitions refers to a registered voter. *See, e.g., In re: Nomination Paper of Cooper,* 102 Pa.Cmwlth. at 139, 516 A.2d 1285

("qualified electors" signing a petition must be registered voters under 25 P.S. § 2911(b) and (c)); *In re: Anastasi Nomination,* 48 Pa. D. & C.2d 143, 144 (1969) ("qualified electors" signing petitions must be registered to vote, applying 25 P.S. § 2911); *In re: Tumolo Nomination,* 48 Pa.D & C.2d 134, 1969 WL 7811 (Pa.Com. Pl.) (under 25 P.S. § 2911, age and residency do not make a petition signer a "qualified elector" unless the signer is also registered to vote).

However, the Commonwealth argues that the term "qualified elector" is ill-defined under 25 P.S. § 2911, and that it might include all residents of a particular electoral district, registered or not. Hearing Transcript, p. 15. At the hearing, the Commonwealth distinguished the above-referenced cases, observing that the term has been defined with respect to the petition signers, but not as to the affiants verifying the signatures. *Id.* Though the Commonwealth urges that we uphold a requirement that petition affiants be registered voters, they argue in the alternative that we should abstain to allow the State courts to give a constitutional construction to the term "qualified elector" which would not limit it to registered voters. *Id.* at 15–17. We now consider the Commonwealth's arguments.

### 1. *Pullman* Abstention

 First, the Commonwealth urges us to abstain from this case while Pennsylvania courts clarify the meaning of the term "qualified elector" under § 2911(d).

 We will not elect to abstain from ruling on this case. In general, federal

---

14. Four factors govern a district court's decision whether to issue a preliminary injunction: (1) whether the movant has shown a reasonable probability of success on the merits; (2) whether the movant will be irreparably injured by denial of the relief; (3) whether granting preliminary relief will result in even

greater harm to the nonmoving party; and (4) whether granting the preliminary relief will be in the public interest. *Gerardi v. Pelullo,* 16 F.3d 1363, 1373 (3d Cir.1994), quoting *SI Handling Systems, Inc. v. Heisley,* 753 F.2d 1244, 1254 (3d Cir.1985).

courts are bound to adjudicate all controversies which are properly before them. *New Orleans Pub. Serv., Inc. v. Council of New Orleans,* 491 U.S. 350, 109 S.Ct. 2506, 2512–13, 105 L.Ed.2d 298 (1989); *Chez Sez III Corp. v. Township of Union,* 945 F.2d 628, 630 (3rd Cir.1991). This request for a permanent injunction is properly before us because the Plaintiffs raise constitutional claims about the validity of a State statute. *See supra* citing 28 U.S.C. § 1331 and P.L. 94–381. In cases presenting constitutional questions, the Third Circuit, in particular, advises abstention only under limited circumstances. *Chez Sez III Corp.,* 945 F.2d at 630 ("[A]bstention is 'the exception, not the rule.' ").

In this situation, we look to *Railroad Commission of Tex. v. Pullman Co.,* 312 U.S. 496, 61 S.Ct. 643, 85 L.Ed. 971 (1941) to determine if the case is appropriate for abstention.[15] In *Pullman,* the Supreme Court urged the federal courts to exercise "wise discretion" when we are "asked to decide an issue by making a tentative answer which may be displaced tomorrow by a state adjudication." *Id.* at 500, 61 S.Ct. 643. The Supreme Court explained: "The reign of law is hardly promoted if an unnecessary ruling of a federal court is thus supplanted by a controlling decision of a state court. The resources of equity are equal to an adjustment that will avoid the waste of a tentative decision as well as the friction of a premature constitutional adjudication." *Id.*

To avoid such wasteful, tentative decision-making, the Third Circuit interpreted *Pullman* to permit abstention from consideration of constitutional questions where three "special circumstances" exist:

(1) Uncertain issues of state law underlying the federal constitutional claims brought in federal court;

(2) State law issues amenable to a state court interpretation that would obviate the need for, or substantially narrow, the scope of adjudication of the constitutional claims;

(3) A federal court's erroneous construction of state law would be disruptive of important state policies. *Chez Sez III Corp.,* 945 F.2d at 631.

Here, even if we accept the Commonwealth's argument that the definition of "qualified elector" is uncertain, under the first test, we do not believe that the second or third tests for abstention are met. With respect to the second criterion, even if we believe the Pennsylvania Supreme Court would give the term "qualified elector" a constitutional construction that it does not require nominating petition affiants to be registered voters, Plaintiffs' constitutional claims survive as to § 2911(d)'s in-district residency requirement.

As to the third test, the Commonwealth's contention that our decision will disrupt the existing elections process is insufficient, because the Commonwealth has articulated no "important state policies" which will be thwarted by our decision. They argue merely, "An erroneous construction of state law by this Court would disrupt important state policies re-

---

**15.** Other types of abstentions are wholly inapplicable to our case. For example, our case does not contemplate a complex area of state law like oil exploration or eminent domain, as under the *Burford*-type abstention. *Burford v. Sun Oil Co.,* 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). Likewise, the case does not involve present state criminal prosecutions (for which reason we might abstain un-der *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971)), or a situation in which the State courts are at an advanced stage of consideration on the same questions, as under *Scott v. Germano,* 381 U.S. 407, 85 S.Ct. 1525, 14 L.Ed.2d 477 (1965). *See generally* for a discussion of types of abstentions *Ryan v. State Board of Elections of the State of Illinois,* 661 F.2d 1130 (7th Cir.1981).

garding the vital electoral process." Defendants' Memo., p. 18. While we agree that elections are vital, we believe this fact justifies our immediate injunction and declaration to protect the citizens' constitutional rights. The Commonwealth's conclusory assertion offers no support for a different result.

### 2. Constitutional Construction Applying *Buckley*

■■■■ Determining the constitutionality of a Pennsylvania statute, we must view the statute as it has been interpreted by the Pennsylvania Supreme Court. *See Commissioner of Internal Revenue v. Bosch's*, 387 U.S. 456, 465, 87 S.Ct. 1776, 18 L.Ed.2d 886 (1967). In the absence of any Pennsylvania Supreme Court precedent, we must predict how that court would decide the issue. *See Polselli v. Nationwide Mut. Fire Ins.*, 126 F.3d 524,

528 (3d Cir.1997); *Scranton Dunlop, Inc. v. St. Paul Fire & Marine Ins. Co.*, 2000 WL 1100779, at *1 (E.D.Pa.). In making this prediction, we should give intermediate appellate court decisions "significant weight in the absence of an indication that the highest state court would rule otherwise." *City of Phila. v. Lead Indus. Ass'n*, 994 F.2d 112, 123 (3d Cir.1993).

■■■■ In the instant case, the Pennsylvania Supreme Court has not defined the term "qualified elector" under § 2911, and the statute nowhere mentions a registration requirement. Though, as we discussed, the lower courts have defined the term in several contexts to include only registered voters, we do not give "significant weight" to these opinions as we interpret § 2911(d), concerning affiants to nominating petitions. Here, we have an "indication that the highest state court would rule otherwise." [16]

---

**16.** The Pennsylvania high court has recently held, "The Election Code must ... be liberally construed in order to protect a candidate's right to run for office and the voters' rights to elect the candidate of their choice." *In re Nomination of Flaherty*, 564 Pa. 671, 679, 770 A.2d 327 (2001). Against this backdrop, the Commonwealth discounts a 1939 Pennsylvania Supreme Court case defining an "elector" as a registered voter under the Liquor Control Act and the Beverage License Act. *Aukamp v. Diehm*, 336 Pa. 118, 121, 8 A.2d 400, 401 (1939). The Commonwealth properly notes that *Aukamp*'s present applications are limited, after numerous amendments in recent decades to the Pennsylvania Election Code and recent United States Supreme Court decisions impacting Pennsylvania statutes. The *Aukamp* decision is particularly irrelevant in the context of § 2911, a statute entirely different from the Liquor Control Act and the Beverage License Act.

Under 25 P.S. § 2868 and § 2869, concerning nominations of major party candidates at primaries, the Pennsylvania Supreme Court has assumed that "qualified electors" who sign petitions are registered voters. *See*, e.g., *In re Nomination of Flaherty*, 564 Pa. at 683, 770 A.2d 327. However, we believe that the Supreme Court would treat differently the

petition affiants, and the nomination of candidates outside the primary system under § 2911, outlining a separate nominations process for candidates of "minor parties" and others. This is not to suggest that the registration requirements of signatories in §§ 2868 and 2869 are constitutional, but to say that we do not have the issue before us presently.

The Election Code in 25 P.S. § 2602(t) defines "qualified elector" with reference to the Pennsylvania Constitution. The Commonwealth Constitution, in its provision regarding qualifications of electors (Pa. Const. Art. VII, § 1), has requirements concerning age, citizenship, state residency and residency in an electoral district 60 days before an election—which would not impact petition circulation, a process completed before August 1. In other words, the definition is inconclusive, for our purposes.

As the Commonwealth observes, the newly-enacted Voter Registration Law (25 Pa.C.S. § 1102, effective March 17, 2002), distinguishes between a "qualified elector" and a "registered elector." The definition of the former relies upon the definition contained in the Pennsylvania Constitution. The latter is defined as "a qualified elector who is registered to vote." This distinction suggests that

Pennsylvania law dictates that its statutes must be interpreted in a manner that does not violate the Constitution. 1 Pa. C.S. § 1922(3). In construing the impact of the Constitution upon State law, the Pennsylvania Supreme Court is bound to follow *Buckley,* 525 U.S. at 182, 119 S.Ct. 636, which we believe clearly outlaws a voter registration requirement for elections petition affiants.

In *Buckley,* the Supreme Court struck down a Colorado statute which required, *inter alia,* that initiative-petition circulators be registered voters. *Id.* The Court extended its holding in *Meyer v. Grant,* 486 U.S. at 414, 108 S.Ct. 1886, in which it rejected Colorado's ban on paying ballot-initiative petition circulators. Justice Ginsburg, writing for the *Buckley* majority, discussed the fundamental constitutional rights at stake in election petition circulation:

> Petition circulation, we held, is "core political speech," because it involves "interactive communication concerning political change." First Amendment protection for such interaction, we agreed, is "at its zenith." We have also recognized, however, that "there must be a substantial regulation of elections if they are to be fair and honest and if some sort of order, rather than chaos, is to accompany the democratic processes." *Buckley,* 525 U.S. at 183, 119 S.Ct. 636 (internal citations omitted.).

Thus, contrary to Representative Cohen's amicus argument that we should only judge whether a rational basis exists for the Commonwealth's policies (Cohen Amicus, p. 10), *Buckley* establishes that election petition circulation entails core First Amendment rights. States must present compelling reasons for infringing upon these rights, sufficient to overcome strict scrutiny.[17] On the other hand, *Buckley* acknowledges the necessity of regulations on the time, place and manner of conducting elections which keep elections orderly and which may incidentally burden candidates, activists and voters. Balancing these equities, Justice Ginsburg specifically denounced any requirement that circulators be registered voters:

> The Tenth Circuit reasoned that the registration requirement placed on Colorado's voter-eligible population produces a speech diminution of the very kind produced by the ban on paid circulators at issue in *Meyer.* We agree. The requirement that circulators be not merely voter eligible, but registered voters, . . . decreases the pool of potential circulators as certainly as that pool is decreased by the prohibition of payment to circulators. Both provisions "limi[t] the number of voices who will convey [the initiative proponents'] message" and, consequently, cut down "the size of the audience [proponents] can reach." *Meyer,* 486 U.S., at 422, 423, 108 S.Ct. 1886; *see Bernbeck v. Moore,* 126 F.3d 1114, 1116 (8th Cir.1997) (quoting *Meyer*); *see also Meyer,* 486 U.S. at 423, 108 S.Ct. 1886 (stating, further, that the challenged restriction reduced the chances that initiative proponents would gather signatures sufficient in number to qualify for the ballot, and thus limited proponents' "ability to make the matter the

---

there are qualified electors who are *not* registered to vote, and we now interpret § 2911(d) accordingly.

**17.** Though *Buckley* specifically invokes the right to free expression, Plaintiffs argue and we agree that free association rights are also concerned, because the candidates claim to have been deprived of their right to expressively associate with non-registered or non-resident citizens who are willing to circulate petitions on their behalf. *See Krislov,* 226 F.3d at 858, 860–861, citing, *inter alia, California Democratic Party v. Jones,* 530 U.S. 567, 120 S.Ct. 2402, 2408, 147 L.Ed.2d 502 (2000).

focus of statewide discussion"). In this case, as in *Meyer*, the requirement "imposes a burden on political expression that the State has failed to justify." *Id.* at 428, 108 S.Ct. 1886. *Buckley*, 525 U.S. at 194–195, 119 S.Ct. 636 (some internal citations omitted).

Keeping *Buckley* in mind, we examine the character and magnitude of the burden imposed by § 2911(d) on candidates' and activists' First Amendment rights and the extent to which the law serves Pennsylvania's interests. *Burdick v. Takushi*, 504 U.S. 428, 433–434, 112 S.Ct. 2059, 119 L.Ed.2d 245 (1992). Laws which are severely burdensome to constitutional freedoms must be narrowly tailored to serve compelling state interests, while less burdensome statutes receive less exacting scrutiny. *California Democratic Party v. Jones*, 120 S.Ct. at 2412.

The Commonwealth first argues that § 2911(d) merely imposes a slight burden because the statute does not restrict unregistered individuals from circulating petitions—only from affirming petition signatures. However, the Commonwealth concedes that although the "affiant does not have to personally gather the signatures, ... he must be present when they are made." Defendants' Memo., p. 7. Counsel provides one example of this distinction's utility, in which a number of unregistered individuals (and/or non-residents of the electoral district) could sit at a table in a mall, collecting signatures, and having them affirmed by a single overseer who is a registered voter (and a resident of the electoral district). Hearing Transcript, pp. 16–17.

This example has very limited application, and is insufficient to distinguish § 2911(d) significantly from the statute struck down in *Buckley*. In fact, most petitions will be completed by circulators at political events, dispersed throughout public places and door-to-door. The Green Party plaintiffs have articulated clearly that they have insufficient volunteers to work as affiants supervising petition circulators in every district of Pennsylvania. Pl. Motion, Ex. A–E. With only a few thousand registered Green Party members statewide—and many fewer working, active members—large swaths of the vast Commonwealth of Pennsylvania would remain inaccessible to Plaintiffs if they are required to have registered voters (and residents of particular districts) on hand at all times in all places during their signature-gathering campaigns.

In other words, employing *Buckley*'s language, the statute's registration requirement limits the number of voices who will convey the Green Party message and cuts down the size of the audience its proponents can reach. In particular, if Morrill needs to gather over 21,000 signatures to support his gubernatorial campaign, and cannot accept the assistance of any Pennsylvanian who might offer it, without first finding a companion for this volunteer who is a registered voter, then Morrill's ability to reach the ballot will surely be jeopardized.

Yet, we do not wish to overemphasize the question of ballot access. That is, § 2911(d) is not unconstitutional simply because it makes it more difficult for candidates to reach the ballot. Representative Cohen, in his amicus brief, contends that the statute "would merely require" a candidate for state legislature "to secure 2 valid signatures per day over the 5–month period allowed in order to get a position on the ballot." Cohen Amicus, p. 23. He argues, "This is hardly a burdensome requirement." *Id.* Rep. Cohen suggests that even if § 2911(d) completely precluded candidates for the state legislature from utilizing volunteers in petition circulation, such a burden would not be severe enough to warrant strict constitutional scrutiny.

Practically speaking, requiring a candidate to seek petition signatures every day during the course of his campaign may be burdensome, inasmuch as he has many other campaign priorities, and may prefer to employ volunteers for the routine task of signature-gathering. *See, Meyer,* 486 U.S. at 423–424, 108 S.Ct. 1886 (citations omitted) ("I think we can take judicial notice of the fact that the solicitation of signatures on petitions is work. It is time-consuming and it is tiresome so much so that it seems that few but the young have the strength, the ardor and the stamina to engage in it . . ."). But even if we accept that collecting two signatures a day is not burdensome to the candidate's ability to seek office in and of itself, we cannot conclude that the statutory requirements imposed by § 2911(d) are constitutional.

The statute continues to burden the candidates' and others' core freedoms of political expression and association. *See Buckley,* 525 U.S. at 183, 119 S.Ct. 636; *Krislov,* 226 F.3d at 858, 860–861. That is, candidates may not associate for purposes of political expression by organizing nominating petition signature drives with whomever they wish. *See Meyer,* 486 U.S. at 424, 108 S.Ct. 1886 ("The First Amendment protects appellees' right not only to advocate their cause but also to select what they believe to be the most effective means for so doing."). Meanwhile, millions of unregistered Pennsylvanians are deprived of their right to associate with candidates in this manner, and cannot express themselves politically by serving as the affiants to their petitions. Burdening the citizens' right of petition circulation burdens "the most effective, fundamental, and perhaps economical avenue of political discourse, direct one-on-one communication." *Id.*

The Commonwealth contends that "even if the affiant must be a registered voter, the pool of affiants available to Plaintiffs is so large that the restriction does not unconstitutionally impede their access to the ballot." Defendants' Memo., p. 7. We note at the outset that this representation may not be wholly correct: it is not always easy to find members of the public, busy with the concerns of daily life, who are willing to volunteer the serious time and energy required to collect petition signatures. Representative Cohen explains, "Individual citizens, interrupted by a petition circulator in the midst of various personal activities, are often motivated more by desire to go back to whatever they were doing than to weight the political consequences of signing a petition." Cohen Amicus, p. 20. Though, as Representative Cohen says from years of political experience, it is difficult to find people willing to pause in their lives long enough to sign a petition, it is many times more difficult finding individuals committed to spending long hours circulating those petitions.

More importantly, the Commonwealth's and Representative Cohen's arguments miss the crux of the *Buckley* court's holding, arguing the converse. The Commonwealth's undisputed evidence suggests that there are 7,775,000 registered voters out of a total Pennsylvania population of 12,281,-054. Defendants' Memo., p. 8. The Commonwealth emphasizes that with nearly eight million registered voters, there should be plenty of people to affirm nomination petitions. *Id.* But in *Buckley,* the Court focuses primarily on the number of individuals *inhibited* by the statute in question, not the number who can still express their political views and associate with candidates. *Buckley,* 525 U.S. at 194–195, 119 S.Ct. 636; *see also Krislov,* 226 F.3d at 851 (focus should be on number of people excluded). The registration requirement impacts millions of un-registered Pennsylvanians, based on the Commonwealth's own calculations.

For all these reasons, we find that demanding that nominating petition affiants in Pennsylvania be registered voters would impose a severe burden on Plaintiffs' and other Pennsylvania citizens' constitutional freedoms. The Commonwealth has presented no compelling or sufficient reason to justify the burdensome registration requirement. The balance of the equities favors Plaintiffs.

In light of *Buckley*, 25 P.S. § 2911(d) must be given a constitutional construction, that "qualified electors" who serve as nominating petition affiants need not be registered voters. If we were to interpret § 2911(d) otherwise, then strict scrutiny of the statute reveals that it is not narrowly-tailored to meet a compelling government interest, it unconstitutionally burdens core First Amendment expression and association, and it must be struck down.

B. Striking Down the In–District Residency Requirement of 25 P.S. § 2911(d)

 Though we were able to eliminate any problematic registration requirement of § 2911(d) with a constitutional construction of the statute, the parties agree that § 2911(d) unequivocally requires that nominating petition affiants in Pennsylvania must be residents of the electoral districts in which they are certifying signatures. Under *Buckley*, this requirement must be subjected to strict scrutiny, inasmuch as it inhibits core First Amendment freedoms. Our findings suggest, however, that even applying much lighter scrutiny, the Commonwealth's justifications for § 2911(d) are insufficient to pass constitutional muster.

1. Other Jurisdictions

Since *Buckley*, several Circuits have examined the constitutionality of state statutes imposing residency requirements on petition circulators and petition affiants.

The Seventh Circuit considered a situation nearly identical to ours in *Krislov v. Rednour*, 226 F.3d at 851. Several candidates sued the Illinois Board of Elections, claiming that requiring signature gatherers to be registered voters of the relevant political subdivisions violated the First and Fourteenth Amendments to the United States Constitution. *Id.* at 855. Krislov asserted in his affidavit—like Price, Shotko and Anthony assert in theirs—that he had "he had friends who were willing and able to help" collect signatures to support his nomination "but who were effectively excluded from helping because of the Illinois statute." *Id.* at 862; Pl. Motion, Ex. B, C, D. The Seventh Circuit found that this "necessarily burdened his speech and associational interests," and held that the burden was substantial. *Id.* In light of the substantial burden, the Illinois statute was subjected to exacting constitutional scrutiny. *Id.* The Court found that under this lens, it could not be seen as narrowly-tailored to serve a compelling state interest. *Id.* at 863.

Specifically, the *Krislov* court rejected the notion that requiring petition circulators to be district residents was needed to ensure local support for candidates. *Id.* at 863. On the contrary, the Court found the law unnecessary, since the signature quota fulfilled this aim. *Id.* Moreover, the Court doubted the State's argument that requiring solicitors to reside in the same district in which the candidate sought office somehow made it more likely that these solicitors would know the district boundaries and collect valid signatures. *Id.* at 864. The Court suggested "a much more narrow law—like one that required candidates to provide *all* circulators with a map showing the boundaries of the district—would be more effective." *Id.* (emphasis in original). The Court believed that a resident would be as likely to obtain an invalid signature as a non-resident, and

that the State's alleged risk of danger to the integrity of the electoral system was remote. *Id.* at 865.

A Second Circuit decision, *Lerman v. Board of Elections in the City of New York*, 232 F.3d 135 (2nd Cir.2000), addressed a factual scenario arguably even closer to that in the instant case. The lead plaintiff in *Lerman* was a nominating petition witness (or affiant) who gathered signatures for an Independent Party candidate. *Id.* at 139. Her collected signatures were invalidated, in part because she was not a "resident of the political subdivision in which the office or position [was] to be voted for," as required by a New York election law. *Id.* The Court found that the statute imposed a heavy burden on the plaintiffs' core political speech and constitutional rights, because the witness requirement so stringently limited the number of voices available to carry a political message, thereby restricting ballot access. *Id.* at 147–148. Specifically, the statute restricted the number of potential petition circulators who, in turn, needed to gain support among a "shrinking pool" of signatories. *Id.*

Thus, applying strict scrutiny, *Lerman* struck down the witness residence requirement of the New York statute, following an earlier District Court decision, *Molinari v. Powers*, 82 F.Supp.2d 57, 73–77 (E.D.N.Y.2000). *Lerman*, 232 F.3d at 149. The *Lerman* court found that the defendants' contention *sounded* legitimate. *Id.* The State said that the statute was designed to ensure integrity and prevent fraud in the electoral process. *Id.* Yet, the statute's importance "in the abstract" was insufficient. *Id.* at 149–150. The local Boards of Elections in New York had statewide subpoena power, so that the State's interest could have been equally served by a requirement that the petition witnesses live anywhere in New York, as

opposed to within a particular district. *Id.* at 150.

The Court further rejected the notion that "district residents are more likely to have 'some familiarity with persons who sign petitions,'" as New York contended, because in "an electoral district consisting of many thousands of voters, the likelihood of district residents having any greater 'personal familiarity' than non-residents is rather low." *Id.* The State's argument was undermined by the fact that the law did not require personal knowledge of the identity of designating petition signatories. *Id.*

The Court found that another New York justification, requiring a candidate to have a "modicum of support" from district residents, was already accomplished by the requirement of obtaining a minimum number of signatures from district residents. *Id.* at 151. Finally, the Court found no room under the First Amendment for arguments implying a State interest in "fenc[ing] out non-residents' political speech—and ... prevent[ing] both residents and non-residents from associating for political purpose across district boundaries." *Id.* at 152.

In sum, *Lerman* held that the witness (nominating petition affiant) residence requirement bore *no* relationship to legitimate state interests, had "no 'plainly legitimate sweep' at all," and was "therefore invalid on its face under the overbreadth doctrine," *inter alia. Id.* at 153, citing *Broadrick v. Oklahoma*, 413 U.S. 601, 612, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973).

The severe burden which § 2911(d) imposes on Plaintiffs' rights in the case at bar is like those imposed by the unconstitutional statutes in *Krislov* and *Lerman*. Green Party candidates and activists from around Pennsylvania have their freedoms of political expression and association sharply curtailed, because they are prohib-

ited from being affiants to nominating petitions for many candidates they support who happen to be running outside the districts in which they reside. Candidates are prevented by § 2911(d) from enlisting the assistance of many willing volunteers. Some citizens are prevented because of their addresses from executing nominating petitions for their own candidacies.

## 2. The Commonwealth's Arguments

■ Pennsylvania's arguments in support of § 2911(d) echo the states' arguments rejected in *Krislov* and *Lerman*.[18] The Commonwealth contends:

> A residency and registration requirement for affiants promotes the state's compelling interest in insuring a fair nomination and election process that expresses the true will of the people. Residents' familiarity with the local population and geography makes more likely that the signatures on the nomination papers are valid. This is important because the Secretary of State has limited power and ability to check the validity of signatures, and objectors have only seven days to file their objections. 25 P.S. §§ 2936, 2937. Assurance of accurate, valid signatures also tends to avoid costly and unsettling court contests. A residency requirement further assures that the affiants will be readily available, either voluntarily or via subpoena, for litigation and investigation into alleged improprieties in the signature collection process....It assures that the affiants will be people with at least some interest and stake in their communities and the electoral process, reinforcing the likelihood that they will have the knowledge and concern to be accurate and honest affiants and available should questions arise. Defendants' Memo., p. 10.

These arguments can be grouped into four categories: those concerning 1) ensuring a fair and orderly election; 2) ascertaining the true will and promoting the interest of the people in the electoral district; 3) validating the petition signatures; and 4) securing the affiants' availability to resolve conflicts concerning signatures. We address and reject each of these in turn, invoking *Lerman* and *Krislov*.

The Commonwealth's first argument about fairness and order is undefined. Counsel elaborated somewhat during the hearing on April 10, 2002, stating, "[T]here's going to be some restriction, because otherwise, you'd have a—just—who wants to run, get your name and sign a piece of paper and you'd have such a disorderly election that you don't know if you'd get anything accomplished." Hearing Transcript, p. 35. While avoiding electoral chaos is important in the abstract, the chosen means of regulation must also be constitutionally sound, as the *Lerman* court noted. *Lerman*, 232 F.3d at 149–150. The district residency requirement is not narrowly-tailored to meet the order objective, which is enforced, in any event, by other Pennsylvania laws. Among many other requirements, § 2911 requires minor party candidates to file documents and obtain many signatures of supporters—not merely "sign a piece of paper." Plaintiffs do not challenge and we do not strike down this statute in its entirety, leaving an electoral anarchy.

In sum, the Commonwealth must "do more than simply 'posit the existence of the disease sought to be cured.'" *Turner Broadcasting Sys., Inc. v. F.C.C.*, 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994); *see Krislov*, 226 F.3d at 865; *Lerman*, 232 F.3d at 150. They have failed to do so with respect to their first argument,

---

**18.** The Commonwealth's only attempt to distinguish *Krislov* and *Lerman* by arguing that our case is unripe—a contention which we have already dismissed. *See supra* Section III regarding justiciability. *See also* Hearing Transcript, p. 17.

concerning fairness and order, and we reject this basis of support for § 2911(d).

The Commonwealth's second argument, that the in-district residency requirement helps to ascertain the will of the district's residents, similarly misses the mark. As both *Krislov* and *Lerman* observed, the local residents' required petition signatures already fulfill this mission. *Krislov,* 226 F.3d at 863; *Lerman,* 232 F.3d at 151.

The third argument—that the residency requirement helps ensure the signatures' validity—is the most clearly flawed. It is patently absurd to suggest that residents of a United States congressional district are in a better position to know the 400,-000+ residents of their district than residents from, say, a neighboring district. *Krislov,* 226 F.3d at 864; *Lerman,* 232 F.3d at 150. First of all, § 2911(d) does not require that the affiants know the signatories, despite confusing statements to the contrary by Defendants' counsel at the April 10, 2002 hearing before us. *See,* e.g., Hearing Transcript, pp. 18–20. The Commonwealth's reference to a "prima facie or ... rebuttable presumption that [the affiant] has this particular knowledge" is without precedent, and untenable. *Id.,* p. 20. When we challenged the Commonwealth at the hearing, suggesting the probability that affiants would not know their petition signatories, counsel responded: "We can accept that that's what's going to happen, but at least, there's the concept that if he, in fact, lives in the judicial district, there's a greater likelihood he knows these individuals more so than someone who doesn't, at least, we want to convince ourselves of that." *Id.* at 24–25. Thus, it seems that counsel is no more convinced of this argu-

ment than the court. As we have noted, Pennsylvania cannot impose a severe burden on the citizens' constitutional rights because of a "concept" when there is no reality to support it.

Finally, for dozens of statewide races, affiants may be residents of any part of Pennsylvania. The Commonwealth cannot suggest that in such races, the affiants know everyone in the State. We can imagine no justification for requiring that affiants possess district knowledge in certain races, such as the contests for United States Congress and the State House of Representatives, but no knowledge for the larger statewide races, such as the Governor's race.

As to the Commonwealth's fourth argument, concerning the affiants' availability to resolve conflicts, the Pennsylvania courts and elections officials possess statewide subpoena power. 42 Pa.C.S.A. § 5905.[19] Thus, Defendants' interests could be served without the in-district residency requirement, by a more narrowly-tailored requirement that the petition witnesses be Pennsylvania residents. *See Lerman,* 232 F.3d at 150.

### 3. In–State Residency Requirement Compared

The case law provides mixed support for a requirement that petition affiants be Pennsylvania residents. *See,* e.g., *Initiative & Referendum Institute v. Jaeger,* 241 F.3d 614, 616–617 (8th Cir.2001) ("As the State has a compelling interest in preventing fraud and the regulation does not unduly restrict speech, we conclude that the [in-state] residency requirement is consti-

---

**19.** This section states, "Every court of record shall have power in any civil or criminal matter to issue subpoenas to testify, with or without a clause of duces tecum, into any county of this Commonwealth to witnesses to appear before the court or any appointive judicial officer." The Federal Rules generally require that individuals reside within 100 miles of the court by which they are subpoenaed, unless a relevant statute provides otherwise. *See,* e.g., Fed.R.Civ.P. 45(b)(2). The 100–mile requirement is also not sensitive to congressional or state legislative districts.

tutional."); *but see Krislov*, 226 F.3d at 866 ("Because circulating nominating petitions necessarily entails political speech, it follows that the First and Fourteenth Amendments compel States to allow their candidates to associate with nonresidents for political purposes and to utilize nonresidents to speak on their behalf in soliciting signatures for ballot access petitions.").

In any event, § 2911(d) requires in-district residency—well beyond a state residency requirement—so we need not resolve the issue. *See Lerman*, 232 F.3d at 150. We observe, however, that requiring Pennsylvania residency of petition affiants has some justification (especially with regard to the subpoena/availability argument), and would be far superior to a district residency requirement. *Id.*

The Commonwealth relies heavily for its arguments supporting the in-district residency requirement on the Eighth Circuit case, *Initiative & Referendum Institute*, which concerned a North Dakota residency requirement. Defendants, citing this case and *Buckley*, contend, "If § 2911(d) only requires the affiants be residents of the state *or district*, the requirement is constitutional." Defendants' Memo., p. 14 (emphasis supplied). This misrepresents *Initiative & Referendum Institute*.

The Eighth Circuit bases its holding largely on the finding that, with the statewide residency requirement, North Dakota served a compelling interest in "protect[ing] the petition process from fraud and abuse by ensuring that circulators answer to the Secretary [of State]'s subpoena power." *Initiative & Referendum Institute*, 241 F.3d at 616–617. But as we have stated with respect to our case, the subpoena power argument applies with no greater force to an in-district residency requirement than a state residency requirement. *See Lerman*, 232 F.3d at 150. Thus, the district residency requirement

cannot be found to be narrowly-tailored to achieve the State's objective. *Id.*

The Eighth Circuit also found that since "all 476,000 of North Dakota's eligible voters may circulate petitions, unlike the situation in *Buckley*," the statewide residency requirement was narrowly-tailored to address the State's interest. *Id.* at 617. On the contrary, under § 2911(d) in Pennsylvania, millions of eligible voters are excluded from being affiants to petitions in every race that is less than statewide, including those for seats in the United States Congress and the state legislature.

In conclusion, we believe that precedents of the United States Supreme Court and federal Circuit Courts clearly compel us to strike down 25 P.S. § 2911(d)'s requirement that affiants to nominating petitions for political office in Pennsylvania must be residents of the districts in which the concerned candidates are running. This provision severely burdens Plaintiffs' and others' protected First Amendment rights of free political expression and association. The requirement is not narrowly-tailored to serve a compelling State interest. On the contrary, the Commonwealth has articulated no significant interest in the in-district residency requirement which could not be served by any number of much less-restrictive policies. The balance of equities favors Plaintiffs.

## VI. FEES AND COSTS

██ Plaintiffs sued two state officials in their official capacities, which was tantamount to suing their offices. *Will v. Michigan Dept. of State Police*, 491 U.S. 58, 71, 109 S.Ct. 2304, 105 L.Ed.2d 45 (1989). Although the Eleventh Amendment prevented Plaintiffs from suing the Commonwealth by name, their injunctive suit against State officials was, for all practical purposes, brought against the State. *Hutto v. Finney*, 437 U.S. 678, 699, 98 S.Ct. 2565, 57 L.Ed.2d 522 (1978). State offi-

cials in their official capacity are considered "persons" for the purpose of granting injunctive relief, fees and costs. *Will,* 491 U.S. at 71, 109 S.Ct. 2304.

■ Plaintiffs seeks attorney's fees and costs associated with this litigation.[20] Federal courts may award attorney's fees and costs to prevailing parties in suits seeking prospective relief against State officials in their official capacities. *Hutto v. Finney,* 437 U.S. at 693–694, 695, 98 S.Ct. 2565. Under the Civil Rights Attorney's Fees Award Act of 1976 (42 U.S.C.A. § 1988), such fees and costs are awarded as a matter of course when plaintiffs are forced to litigate against state-sponsored opposition in order to vindicate their constitutional rights. *See,* e.g., *May v. Cooperman,* 578 F.Supp. 1308 (1984).

Thus, we will grant Plaintiffs reasonable attorney's fees and costs arising from the prosecution of this case.

## VII. CONCLUSION

We will construe 25 P.S. § 2911(d) such that election nominating petition affiants in Pennsylvania need not be registered voters. We believe that precedents of the United States Supreme Court and federal Circuit Courts clearly compel us to find that the First and Fourteenth Amendments to the Constitution prohibit those portions of § 2911(d) which require affiants to be residents of the particular electoral districts in which candidates are running. We declare all such provisions to be unconstitutional and void. We also find that Plaintiffs are entitled to attorney's fees and costs.

An order consistent with this opinion follows.

## ORDER

And now this 19th of April, 2002, we FIND, DECLARE and ORDER that 25

P.S. § 2911(d) does not require that nominating petition affiants in Pennsylvania must be registered voters. We further FIND, DECLARE and ORDER that portions of 25 P.S. § 2911(d) which require that nominating petition affiants in Pennsylvania must be residents of particular electoral districts unconstitutionally violate the citizens' rights to free political expression and association, under the First and Fourteenth Amendments to the United States Constitution.

Accordingly, Plaintiffs' Motion for a Preliminary Injunction, filed March 25, 2002, is GRANTED, but as a permanent injunction restraining enforcement of the portions of 25 P.S. § 2911(d) which we have declared unconstitutional. The Defendants are hereby PERMANENTLY ENJOINED from enforcing these provisions.

It is hereby ORDERED that the parties shall contact the Court within five (5) business days of the date of this order for a conference to coordinate implementation of this ORDER.

---

**20.** *See supra* Footnote 7, regarding damages.