[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] DECISION
This action, brought by plaintiff Teri Ohs, in her capacity as President of the Wickford Elementary School Parent Teacher Organization (the "PTO"), asks this Court to declare that the public notice given by the defendants for a meeting convened by the North Kingstown School Committee (the "School Committee") on May 11, 2005, at which it voted to close the Wickford Elementary School as part of its action on the proposed budget for the North Kingstown School District for fiscal year 2005-2006 and its move toward consolidation and reconfiguration or pairing of the remaining elementary schools in the district, violated the Open Meetings Act, R.I. Gen. Laws § 42-46-6, as it did not adequately inform the public of the nature of the business to be discussed and voted upon at that meeting. As a result of that claimed violation of the Open Meetings Act, plaintiff asks this Court to declare the May 11, 2005 vote to close the Wickford Elementary School null and void and to enjoin the School Committee from taking any further action to implement that vote of school closure or to effectuate consolidation or reconfiguration of the schools in the district until another vote, upon proper public notice, can be held. The defendants counter that because plaintiff and the public had a full and fair opportunity to know about and participate in the meeting of May 11, 2005 — as a result not of their published notice but of notice from the media and others — plaintiff cannot be found to have legal standing to bring this action and the action, even if viable, cannot succeed.
For the reasons set forth in this Decision, this Court grants plaintiff standing and declares that public notice of the School Committee meeting scheduled for May 11, 2005 violated the Open Meetings Act, R.I. Gen. Laws § 42-46-6, as it did not fairly apprise the public that the issues of school closure and consolidation would be discussed, and the issue of closure of the Wickford Elementary School voted upon, at that meeting. As an extension of this ruling, and after consideration of the interests of all parties and the public, the Court declares null and void the May 11, 2005 vote to close the Wickford Elementary School. It further enjoins the School Committee from taking any action to further implement that vote or the closure, consolidation or reconfiguration of the elementary schools that flowed from it until another vote can be had on the issue of school closure, after fair notice to the public, in strict compliance with the Open Meetings Act and this Decision, that the issues of school closure and consolidation of the elementary schools are to be discussed and the issue of closure of the Wickford Elementary School voted upon.
It is not the prerogative of this Court to tell the School Committee how to vote on these critical issues; instead, this relief is being ordered to ensure that from this day forward, there will be full and fair public participation in the decisions of its School Committee that are fundamental to the future education of its children.
 FACTUAL BACKGROUND The Prelude to the May 11, 2005 Meeting: The Issues Of School Closure And Consolidation Are Taken Off The Table
Throughout the winter and spring of 2005, the School Committee held regular public meetings at which it discussed, among other issues, the proposed 2005-2006 fiscal year school budget. See Joint Exhibit A (Agenda and Minutes of School Committee Meetings from January 19, 2005 through June 29, 2005). It would prove to be a difficult budget year for the School Committee, as it had to wrestle with the fact that state and local revenues were expected to fall significantly short of the monies it would need to continue the existing operations of its schools. Id.
Dr. James Halley, Superintendent of the North Kingstown School Department, served as Clerk of the School Committee and was responsible, in his role as Clerk, for preparing and distributing the public notices of the agenda for upcoming School Committee meetings. Halley Hearing Testimony. His practice was to submit the agenda for publication, approximately 10 days before the usual Wednesday meetings, to theIndependent — a weekly newspaper that is published on Thursdays and serves North Kingstown. Id.
The School Committee began its consideration of the budget at its meeting of January 19, 2005. See Joint Exhibit A. The published "Agenda" for that "Business Meeting" listed as "New Business" the "Presentation of the Superintendent's 2005-2006 School Budget." Id. At that business meeting, Dr. Halley presented two alternative budgets to the School Committee that each totaled close to 100 pages — one with a white cover that contemplated a full-day kindergarten program and operation of 7 elementary schools (the "white budget") (Defendants' Exhibit E) and another with a yellow cover that contemplated a half day kindergarten and operation of 6 elementary schools (the "yellow budget") (Defendants' Exhibit F). Id. He first explained the white budget and then presented the yellow budget as an alternative budget for the School Committee to consider. Id. He explained that the yellow budget assumed closure of the Wickford Elementary School and consolidation and reconfiguration of the remaining 6 elementary schools into: (1) 4 schools that would serve grades K through 3; and (2) 2 schools that would serve grades 4 and 5. He stated "that he does not necessarily want or recommend the alternative budget, but felt two budgets should be presented." Id. He also stated that "the white budget is what we should be doing but he prepared the yellow [budget as an] alternative and the School Committee has to decide which they will accept." Id. The School Committee voted unanimously to accept receipt of the two Superintendent's budgets. Id.
The published Agenda for the "Budget Worksession Meeting" on January 31, 2005 (a meeting not listed under "Upcoming Meeting/Events" on the "Agenda" for the January 19, 2005 meeting) listed under "New Business" the following topic: "2005-2006 Budget/Consolidation Discussion." Id. It made no mention of school closure. At that "Budget Worksession," Donald DeFedele, Chairperson of the School Committee, welcomed the public and indicated that the School Committee would be discussing the two budgets handed out at the January 19, 2005 meeting. Id. He stated that he "thought that the majority of the time at this meeting would be spent on the "white budget." Id. General discussion took place among the School Committee members regarding both budgets that is reflected in the minutes only as discussion of the "white budget." Id. Dr. Halley stated that "the white budget is educationally the best way to go, but the committee `needs to make some value decisions based on the white budget, and then get to the yellow budget and take a look at it.'" The public (including plaintiff Ohs who was in attendance) commented on the issues of school closure and consolidation in the yellow budget as well as on more general budget issues. Id. The School Committee took no action regarding the budgets. Id.
The published "Agenda" for the next meeting on February 2, 2005 described it as "Worksession" and listed under "Unfinished Business" the following topic: "School Budget 2005-06." Id. It made no mention of consolidation or school closure. Id. At that meeting, which the "Minutes" characterize not as a "Worksession" (as had the "Agenda") but as a "Business Meeting," Dr. Halley presented a list of "possible considerations for budget cuts" to attempt to narrow the gap between what the Town Council had targeted for appropriation to the School Department and the expenses projected in the proposed budgets. Id. Included on the itemized list were closure of the Wickford Elementary School and school consolidation. Id. While he presented the list generally, he stated that he was not recommending anything specific, and there was no real discussion of these items. Id.
The published Agenda for the next meeting on February 9, 2005 described the meeting as a "Budget Worksession Meeting" to be held at the Central Administration Office (the usual place for meetings unless a large crowd is expected) and listed under "New Business" (contrary to the description contained in the prior meeting's agenda of "Unfinished Business") the topic: "2005-2006 School Budget/Consolidation Discussion." Id. It made no reference to school closure. Contrary to the published "Agenda," the "Minutes" describe that meeting not as a "Budget Worksession Meeting" but as a "Business Meeting" that was held not at the Central Administration Office but at North Kingstown High School. Id. The Minutes as well as the location of the meeting suggest a large crowd in attendance.
Dr. Coppa, the Vice Chairperson of the School Committee, opened the meeting in the Chairperson's absence, welcomed the public, and invited any citizens who desired to speak to sign up on a sheet. Id. She stated that the School Committee "had received a great deal of emails concerning subjects of the budget and reconfiguration of the schools and closing Wickford Elementary." Id. She also stated "that many communities in Rhode Island are under a severe budget crisis because of huge increases in health care and the state mandated pension fund." Id. She stated further "that it is apparent that in the 2005-2006 budget, full day kindergarten will not happen, the district will not expand the SmART program and the focus will be primarily on running the educational programs that are currently in the school district." Id. She later stated "that if the committee decides not to redistrict or close Wickford Elementary School at this time, it does not preclude them from doing so at a later time."Id.
Barry Martasian, a member of the School Committee, indicated that "he had been reading a lot of emails from people concerned about the closure of Wickford Elementary School and the redistricting of the other elementary schools stating the same arguments of three years ago." Id. He said that "it is not three years ago. We have a budget crisis now. I was against redistricting then, but this year we have to do things we don't want to do. The public has to understand what kind of situation we are in. We are up against the voters, the Town Council, the lack of money, and a desire to keep the quality education that we have." Id.
Dr. Halley stated "that while the School Committee may submit a budget higher than the cap directed by the Town Council, they will cut it." Id.
He said that "the committee has a budget that is $6 million above the cap `when you leave 7 schools with no additions.'" Id. Dr. Halley said "he didn't know any other way to get to the cap and save programs `other than closing a school and changing zones.'" Id. He went on to say that "this crisis has been coming for awhile `because the budgets have been eroded. Last year there was no support for a referendum. The Town Council cannot go over a cap, only the voters can do that. No one wants to close a school and redistrict children. Doing this saves programs.'" Id. His comments, therefore, reflected a very different tune than the one he sung earlier in January when he presented the yellow budget as the lesser alternative.
In response to questions from Melvoid Benson, a member of the School Committee, Dr. Halley indicated that he could not come up with another budget that would be within the cap imposed by the Town Council if it did not involve school closure and consolidation. Id. He defended his recommendation to close Wickford Elementary School and stated that "he cannot provide a budget that gets to a place without cutting programs that are not required by law, but are essential, without closing a school." Id.
Bill Mudge, a member of the School Committee, then moved that Dr. Halley present to the School Committee another budget that reflects cuts that comply with the Town Council's cap. Id. Melvoid Benson seconded the motion. Id. Janice DeFrancis then moved to amend the motion to include that the new budget to be presented by Dr. Halley be for 7 schools, and Melvoid Benson seconded the amendment. Id. The School Committee unanimously approved the motion, as amended. Id. The public (inclusive of plaintiff Ohs) spoke on issues related to the budget, school closure, and consolidation. Id.
The published "Agenda" for the next meeting on February 16, 2005, to be held at North Kingstown High School, listed the meeting as "Business Meeting" and identified the topic of the meeting, under "Unfinished Business," as "School Budget 2005-06 for Action." Id. It also listed under that category of business, "Full Day Kindergarten for Action." Id.
Unlike the "Agenda" for the two prior meetings, this "Agenda" did not mention school consolidation as an item for discussion or action. Id. It also did not mention school closure.
At the meeting, Dr. Coppa moved that the School Committee adopt the new 7 school budget presented to the committee that evening, and Mel Benson seconded the motion. Id. Discussion then followed during which Dr. Halley opined that "to keep 7 schools at the expense of programs now, to him, was not the right decision because `we will be closing a school for the same reason in the future.'" Id. Dr. Coppa then listed budget cuts that she thought would make it possible to keep 7 schools. Id. Dr. Halley responded that to make the decision to keep open 7 schools, even with agreement on Dr. Coppa's suggested cuts, would require the School Committee to find $1.3 million in additional cuts to meet the Town Council's School Department spending cap. Id. The 2005-2006 budget discussion then was moved to the following night's previously scheduled budget work session meeting for continued debate. Id. The agenda item of "Full Day Kindergarten for Action" was "to be discussed and voted upon during budget discussions." Id. The Minutes for the meeting do not reflect that any public discussion occurred. Id.
The "Agenda" for the School Budget Worksession Meeting" to be held the next evening, on February 17, 2005, that was published prior to the meeting of February 16, 2005, listed under "New Business" the topic: "2005-2006 School Budget/Consolidation Discussion." Id. It did not mention school closure. At this meeting, the School Committee voted 5 to 1 to adopt an amendment to the motion from the February 16, 2005 meeting that provided for keeping 7 schools and accepting a new list of budget cuts proposed by School Committee member Janice DeFrances. Id. Members of the public, including plaintiff Ohs, commented on the budget. Id. The School Committee also voted 5 to 1 to approve a 7 school budget in the amount of approximately $51 million. Id. The issues of school closure and consolidation, therefore, were off the table.
In late February and throughout March of 2005, the School Committee continued to discuss the budget and possible cuts to bring it in line with the Town Council's cap. "Things settled down for awhile," as Dr. Halley testified at the hearing, presumably because the School Committee was just trying to make additional budget cuts and had not run out of ways to cut expenses, while preserving 7 schools, without unduly sacrificing programs. Halley Hearing Testimony.
The published "Agenda" for a "School Budget Worksession Meeting" to be held at North Kingstown High School on February 23, 2005 listed under the category of "New Business" the topic: "2005-2006 School Budget/Consolidation Discussion." Id. At that "Business Meeting," the School Committee approved many additional budget cuts and voted to submit to the Town Manager a budget of slightly over $51 million, even though there was sentiment expressed that it would not be accepted by the Town Council because it exceeded the cap. Id.[1] The Minutes do not reflect that any other public discussion occurred. Id.
The published "Agenda" for the meeting of March 3, 2005 advertised it as a "School Budget Worksession Meeting" and included under the heading of "New Business" the topic: "2005-2006 School Budget/Consolidation Discussion." Id. It did not mention school closure. The "Minutes" for that meeting describe it as a "Budget Meeting" and reflect the Chairperson's report of a meeting between the School Committee and the Town Council on March 2, 2005. Id. Chairperson DeFedele said that at that joint meeting, the Town Council stated that the 2005-06 school budget would not be allowed to exceed the cap set forth by the Town Council. He also noted that the Town Manager indicated that he would be making additional cuts of $583,000 to the submitted budget, and the Chairperson commented that it would be the School Committee's duty at the meeting to make those cuts instead. Id. After discussion of additional cuts, the School Committee voted 5 to 2 to make additional cuts totaling $663,000.Id. In so voting, however, members expressed concerns about going forward with 7 schools if it meant cutting programs this deeply. The School Committee, at the meeting, also received a letter from the North Kingstown Historic District Commission expressing concerns about the possible closure and/or adaptive re-use of the Wickford Elementary School and asking that the Town Council seek an advisory opinion from it before changing the use of the school. Id.
The published "Agenda" for the meeting of March 9, 2005 advertised a "Worksession" and listed under the category of "Unfinished Business" the topic: "2005-06 School Budget." Id. The discussion at the work session centered largely on the consequences of cutting the technology budget as contemplated. Id.
The published "Agenda" for the meeting of March 23, 2005 advertised a "Business Meeting" for March 23, 2005 at the Central Administration Office and listed under "Unfinished Business" the topic: "2005-06 School Budget." Id. In fact, the Business Meeting was held at the North Kingstown High School. At the meeting, a few citizens commented about adverse effects of the budget cuts voted upon by the School Committee.Id. Dr. Halley commented "that there was inaccurate information being disseminated regarding a `surplus.'" Id. He said "the only surplus is $180,000 in excess revenue not appropriated by the Town Council last year, which has recently been appropriated into next year's budget by the Town Manager." Id. The School Committee voted unanimously to rescind all of the cuts to the budget that it had approved by its vote on March 3, 2005. Id.
 The Issues of School Closure and Consolidation Are Put Back OnThe Table
The published "Agenda" for the School Committee's next meeting on April 13, 2005 advertised a "Worksession" and listed under "Unfinished Business" the topic: "2005-06 School Budget." Id. The notice did not indicate that any new business related to the budget would be discussed nor did it include consolidation or school closure as topics for discussion at the meeting. At that meeting, Chairperson DeFedele reminded the School Committee that even though they had already made cuts of over $3.4 million to the budget, there was $663,000 that it rescinded in cuts from the budget at its last meeting, and they still needed to find an additional $584,000. Id. Dr. Coppa stated "that she had identified smaller cuts but could not come up with $600,000 worth of cuts without decimating programs." Id. She said "I don't know what to do without turning the whole thing around." Id. Other committee members shared her sentiment that additional cuts should not be made to programs within the budget. Id. Dr. Halley then offered to go back to the 6 school yellow budget that he had previously submitted to the School Committee, take the cuts that they had agreed upon and provide them with a 6 school budget for the next meeting. Id.
Significantly, the School Committee then voted 5 to 1 to rescind the 7 school budget that it had approved in February 2005. Id. Members wanted to discuss the issue of closure of Wickford Elementary School at the next meeting, considering why it should be closed as opposed to some other elementary school. Kathy Brown, a member of the PTO, who like plaintiff Ohs had attended many earlier school committee meetings on the budget, suggested that the Chairperson "should rethink the way the next meeting runs so that the community will be able to have input on this topic since things have changed." Id. Dr. Coppa agreed and suggested "that new documents be posted on the district's webpage so the public could view them as well as the School Committee." Id. Chairperson DeFedele said "that for the 2005-06 school budget item the committee will handle it as a Worksession with public and committee dialog." Id.
The issues of closure of the Wickford Elementary School and consolidation and reconfiguration of the school district that were taken off the table by the School Committee at it meetings in February 2005 now were clearly back on the table. Spring break would intervene between this meeting and the next.
Notwithstanding the concerns expressed at the April 13, 2005 meeting by members of the School Committee and the public that care be taken to notify the public that issues of closure of the Wickford Elementary School and school consolidation and reconfiguration (that had been newly placed back on the table) would be discussed (and perhaps voted upon) at the next School Committee meeting, the "Agenda" for that meeting of April 27, 2005 merely stated that a "Business Meeting" would be held at the Central Administration Building to take up the "Unfinished Business" of the "2005-06 School Budget." Id. The notice made no mention of school closure, consolidation or reconfiguration and no mention of any "new" business regarding the budget, even though new issues relating to school closure and consolidation were back on the table. It did not indicate that any action would be taken to close Wickford Elementary School to pave the way for reconfiguration of the school district, even though Dr. Halley fully anticipated, at the time he prepared the notice, that the school closure issue would be voted on at the meeting. See Halley Hearing Testimony.
At the "Business Meeting" on April 27, 2005, Dr. Halley made a "PowerPoint presentation of school comparisons which was comprised of `Data to assist in school closure decisions' to the School Committee."Id. With this presentation, Dr. Halley "outlined the rationale behind his conclusion that Wickford Elementary School should be the committee's choice for closure." Id; see Defendants' Exhibits I, J.
Melvoid Benson then asked Dr. Halley "if he had made the presentation to school parent groups such as the PTOs and SACs." Joint Exhibit A. When he replied "that the presentation had not been made anywhere else but at this meeting, but that it could be found on the website," Ms. Benson "suggested that the committee forego voting this evening on the topic, and give the public a chance to come in with their ideas even if there has to be a special meeting to make a decision." Id. The School Committee then voted unanimously to accept Dr. Halley's report and vote on it at their next meeting. Id. Dr. Halley went on to say "that closing a school is only the first decision the committee needs to make. They then need to determine if they are going to continue with the reconfiguration of the school system." Id. He also indicated that time was running out, the School Department was already behind schedule, the Town Council would be making its decision on its budget in the next week and that any taxpayer referendum request would have to be made by June 15, 2005. Id.
According to Dr. Halley, over a hundred citizens attended this meeting. Halley Hearing Testimony. The Minutes reflect public comment by several members of the community. Id. Plaintiff Ohs attended this meeting and thus knew that the issue of school closure would be voted on at the next meeting. Ohs Hearing Testimony.
 The May 11, 2005 Meeting
Following the April 27, 2005 meeting, there is no evidence that the School Committee, or Dr. Halley in particular, made any effort to further educate the public about the fiscal need for school closure and consolidation, the basis for his recommendation to close Wickford Elementary School or the fact that the School Committee would be discussing and acting on those issues at its next meeting on May 11, 2005. Dr. Halley crafted the "Agenda" for the May 11, 2005 meeting that gave notice simply of a "Worksession" to be held at the Davisville Middle School to take up as "Unfinished Business" the "2005-06 School Budget."Id. Again, he made no mention of school closure or consolidation, he did not indicate in the notice that any new business related to the budget would be discussed but instead suggested that the same old, unfinished budget business would be the subject of the meeting, and he did not indicate that any action or vote would be taken on the issues of school closure or consolidation, even though the School Committee had voted at its last meeting to vote on the issue of closure of the Wickford Elementary School at this meeting. Id. There is no evidence that Dr. Halley made his presentation to any of the PTOs. Id.
Indeed, it is only through the efforts of the media and the Parent Teacher Organizations in the elementary schools that the public finally became aware that decisions of closure of Wickford Elementary School and consolidation and reconfiguration of the school district might be on the immediate horizon. See Ohs Hearing Testimony. Both the North EastIndependent and The Standard-Times carried front page articles on May 5, 2005 about the upcoming meeting. The headline in the Independent read "School closure decided next week." Defendants' Exhibit G. The headline in The Standard-Times read "Wickford Elementary may still close." Defendants' Exhibit L. The Independent also carried in the same paper, on page 3, the School Committee notice of the May 11, 2005 meeting at issue here (that plaintiff Ohs said she did not see or rely on at the time) that simply identified unfinished business related to the school budget as the meeting topic. Defendants Exhibit G. Each paper on the same dates also carried Letters to the Editor from plaintiff Ohs and Dr. Halley regarding issues of school closure, consolidation and enrollments. See
Defendants' Exhibits M, N and O. In addition, the Independent carried an Editorial on May 5, 2005 entitled "Stop the school shuffle." See
Defendants' Exhibit P.
After the April 27, 2005 meeting, plaintiff Ohs made efforts to try to get the word out about the May 11, 2005 meeting to members of the Wickford Elementary School PTO and others by word of mouth, passing out a couple dozen flyers at a Rotary Club breakfast and a lacrosse game (that advocated attendance at the May 11, 2005 meeting to vote for 7 schools and no pairing or reconfiguration of the elementary schools) (see Defendants' Exhibit H), perhaps attending a PTO meeting on the subject and participating in a televised candlelight vigil on May 10, 2005 to protest any decision to close the Wickford Elementary School. Ohs Hearing Testimony.
She testified that her job was hampered because she understood that she was not allowed to post any notice of School Committee meetings on the Wickford Elementary School's Listserve (the email service that allowed a sender to reach all parents who registered to receive email from the school) or send home any written notices through flyers directed to teachers for placement in the students' backpacks that differed from the official agenda published by the School Committee. Id. That agenda for the May 11, 2005 School Committee meeting indicated only that unfinished school budget business would be discussed. It was her belief, at least, that people did not know what was going on. Id.
While Ms. Hienerwadel testified that at the PTO's request, a mailing to all Wickford Elementary School parents who asked to receive emails went out over the Listserve to inform them that the decision to close a school and reconfigure/pair the remaining schools would be made at the meeting of May 11, 2005, see Defendants' Exhibit D, this Court is not convinced, based on the testimony and documents presented, that it is more likely than not that such a distribution occurred or that its content matched that in Defendants' Exhibit D. While it is possible that distribution occurred to some parents, it does appear that the school and parents were having communication about such a mailing. See Hienerwadel Hearing Testimony; Defendants' Exhibits B, D.
At the May 11, 2005 "Worksession," hundreds of citizens came to the meeting — more consistent with the public's presence at the meetings in late January and early February where school consolidation was advertised for discussion and the School Committee acted to take the issues of school closure and consolidation off the table than with the meetings in the interim. The meeting was contentious, full of debate and lasted until almost 1:00 a.m.
Chairperson DeFedele opened the meeting by reading prepared comments.[2] Dr. Coppa stated "that she had received emails from the community asking what else could be done." Id. She "suggested a proactive stance from the public; ask for a referendum to increase the school budget."Id. She stated "that all that is needed is `300 signatures delivered to the Town Hall by May 24.'" Id.
According to the Minutes, approximately two dozen citizens commented on the budget and the issues of school closure and consolidation. Plaintiff Ohs presented survey results from Wickford Elementary School; out of 109 returned, 94% voted not to close, 89% voted to keep the current configuration of the schools. Id. She testified that she did not receive those results until the meeting. Ohs Hearing Testimony. Similar results were presented for three of the other elementary schools, indicating that large numbers of parents did not want a school closed, pairing of schools or consolidation. Id. Several people spoke against closure and consolidation, several others spoke in favor of those options over program cuts and many others decried the lack of further financial assistance from the State or Town Council. Id. The record does not disclose the extent of participation on the part of PTO parents (other than Teri Ohs and Kathy Brown). Id.
Chairperson DeFedele said that while there may be additional funds coming from the State, this budget must be decided before those funds become available. Id. Dr. Halley highlighted that the elementary school age population was decreasing while the North Kingstown population was increasing and that with a spending cap, additional revenues would not matter. Id. He said pairing would save the School District $475,000. Id.
A motion by Melvoid Benson and seconded by Bill Mudge for "7 schools and no pairing" then failed by a vote of 4 to 3. Id.
Bill Mudge suggested that various categories of money were available, and he was confident that the Town Council would give the School Committee the additional funds necessary to keep open the 7 schools, after which the Chairperson commented that a vote needed to be taken, either way, so that the School Department could function and the parents could plan. Id. Melvoid Benson shared Mudge's view that the people would support a referendum. Id. A roll call vote for "7 schools and no pairing" failed by a vote of 5 to 2.
At this point, it was close to 11:30 a.m. and Melvoid Benson "moved to return to citizen's comments as the list to speak was not complete." Id.
The School Committee motion passed 4 to 3 with all subsequent speakers advocating against school closure and consolidation. Id. Dr. Coppa then declared that the committee still had more cuts to make and moved to end the debate. Id. The School Committee unanimously approved that motion.Id. Bill Mudge then moved to send a letter to the Town Council to restore $312,000 to increase the bottom line of the 2005-06 school budget with the intention of keeping 7 schools open. Id. The School Committee approved that motion with a vote of 4 to 3. Id.
Dr. Coppa next asked the Chairperson to call the question. Id. The School Committee then voted 4 to 3 to close the Wickford Elementary School. Id. After some additional public comment, the meeting adjourned at 12:50 a.m. Id.
 The Aftermath of the May 11, 2005 Meeting
The published "Agenda" for the next School Committee meeting advertised a "School Budget Meeting" and a "Budget Worksession Agenda," listing as "New Business" the "2005-2006 School Budget and Consolidation of 6 Elementary Schools." Id. Ironically, unlike the notices for the critical meetings of April 27, 2005 and May 11, 2005 where the new business of school closure and consolidation were back on the table but no notice was given to that effect, this notice — for a meeting that followed a vote to close the Wickford Elementary School that paved the way for consolidation and reconfiguration — contained notice of consolidation of 6 elementary schools.
At this meeting, the School Committee discussed the possible reconfiguration of the remaining 6 elementary schools into primary and intermediate level grade schools. Id. Dr. Halley made another PowerPoint presentation that purportedly was appended to the Minutes (although not submitted to the Court by the parties as part of their Joint Exhibit A) that outlined the proposed reconfiguration of the district. Id.
Chairperson DeFedele indicated that with the closing of Wickford Elementary School, there was a potential of $650,000 in savings and that, with consolidation, there was an additional $478,000 that could be saved or that would have to be cut elsewhere. Id. He estimated, therefore, that a referendum for 7 schools and no pairing would need to be for more than $500,000 and at least $1.2 million. Id.
A motion was made to "reconfigure the elementary schools into 4 primary schools: kindergarten to third grade, and 2 intermediate schools: 4th and 5th grade." Id The School Committee proceeded to discuss reconfiguration and received a report from the Town Council President who indicated that the Town Charter precludes adding funds to the school budget after the town budget has been appropriated, which was on May 4, 2005 (prior to the May 11, 2005 vote to close Wickford Elementary School). Id. He asked that the School Committee take the "proper amount of time to make their decision, and look to make a long range plan." Id. The School Committee, after further discussion, voted 4 to 3 to reconfigure the schools. Id.
At its "Business Meeting" on May 25, 2005 that had been noticed with an "Agenda" that listed simply "2005-06 School Budget" under "Unfinished Business," with again no reference to the issues of school closure or consolidation that were still in the mix based on the exploration of additional funding sources, the School Committee voted unanimously to postpone further discussion of the budget until more information became available. Id. Based on the discussion at the meeting, it appears that there was the potential of increased funding based on a proposed referendum for $500,000. Id.
At the next "School Committee Worksession" on June 8, 2005, after giving published notice of an "Agenda" listing "2005-06 School Budget" as a topic under "Unfinished Business," the Chairperson thanked the voters for supporting the June 7, 2005 referendum seeking to add $500,000 to the school budget. Id. Based on the Minutes for that meeting, however, it appears that the referendum did not pass. Id. There was some speculation that it did not pass because citizens did not think that the additional money would ensure either 7 schools or no pairing. Id.
Dr. Halley then outlined the budget cuts that had been made to date, inclusive of the savings from the Wickford Elementary School closure and reconfiguration of the remaining 6 elementary schools, and stated that $1 million more in cuts would be necessary to stay under the cap set by the Town Council. Id. The School Committee then proceeded to make more budget cuts. Id. A motion by Bill Mudge and seconded by Melvoid Benson to request an emergency joint meeting with the Town Council to request an increase of $600,000 and to suspend further action on the budget until after that meeting passed by a vote of 4 to 3. Id.
At the next School Committee "Business Meeting" on June 8, 2005, after giving published notice of an "Agenda" listing "2005-06 School Budget" as a topic under "Unfinished Business," but again making no reference to school closure or consolidation even though efforts still were being made by the School Committee and the public to explore additional funding, members of the public, including plaintiff Ohs, spoke against school closure and reconfiguration and asked the School Committee to rescind its prior votes. Id. The School Committee then voted unanimously to ask the Town Council to fund $500,000 in capital expenses from the school operating budget to the school capital improvement fund (making this request contingent on a guarantee from the Town Council that the school capital reserve fund be fully funded in the next budget and the school operational budget be increased by the $500,000 in capital expenses). Id.
That vote further provided that, assuming pension reform passes at the state level and additional savings of at least $500,000 are realized in the school budget, all additional money would be used for the purpose of not reconfiguring the schools and reopening Wickford Elementary School.Id.
According to the "Agenda" put into evidence by the parties, the School Committee met jointly with the Town Council in an emergency joint session on June 25, 2005 and met again on June 29, 2005 on its own for a "Business Meeting" to discuss "Unfinished Business" inclusive of the "2005-06 School Budget." Id. As the parties failed to provide the Court with the minutes of either of those meetings, their content cannot be summarized for purposes of this Decision. Id.
 PROCEDURAL HISTORY
On July 21, 2005, plaintiff Teri Ohs, in her capacity as President of the Wickford Elementary School Parent Teacher Organization, brought suit for declaratory and injunctive relief, attorney's fees and a civil fine against defendants North Kingstown School Committee, Donald DeFedele, in his capacity as Chairperson of the North Kingstown School Committee, and James Halley, in his capacity as Agent of the North Kingstown School Committee, for their alleged willful violation of the Open Meetings Act by failing to specify consolidation as a topic for discussion in the notice given for the May 11, 2005 School Committee meeting. See
Plaintiff's Complaint. Plaintiff asks this Court to declare that notice violative of the Open Meetings Act, R.I. Gen. Laws § 42-46-6, and to declare null and void the May 11, 2005 vote of the School Committee to close the Wickford Elementary School.
Plaintiff Ohs filed with her complaint a motion for a temporary restraining order by which she asked this Court to enjoin the defendants from taking any action to close Wickford Elementary School or otherwise to implement a vote to close that school taken by the School Committee at its May 11, 2005 meeting. After a conference with the Court on July 26, 2005, the parties agreed to entry of a consent order that provided that no action would be taken by the defendants to close the Wickford Elementary School, to implement the vote taken by the School Committee on May 11, 2005 to close that school, or to reconfigure or modify the other schools in the district to accommodate additional students as a result of that school closure, pending further decision by the Court after a consolidated hearing on plaintiff's request for a preliminary injunction and a trial on the merits with respect to plaintiff's request for a declaration that the May 11, 2005 school closure vote violated the Open Meetings Act.
The order also bifurcated the issue of the willfulness of the defendants' conduct and plaintiff's request for a civil fine for a later trial, if necessary. The order further provided that counsel for the defendants would provide plaintiff's counsel with written notice of all School Committee meetings at least 48 hours in advance of such meetings. Without taking a position on whether the School Committee should or should not vote again on the question of school closure after proper notice to the public, the Court encouraged the School Committee to at least consider whether to do so in light of this pending litigation.
On August 1, 2005, the School Committee apparently met in Executive Session to discuss the litigation. Dr. Halley, through counsel, apparently did not give notice of that meeting to plaintiff's counsel until Saturday morning, July 30, 2005, at her place of business (when she was not in the office because it was the weekend), even though he acknowledged knowing of the upcoming meeting at least by Friday, July 29, 2005. After a status conference on August 4, 2005, the School Committee ultimately decided to go forward with the hearing on August 5, 2005. It apparently has scheduled a meeting for August 10, 2005 to vote on the issue of closure of the Wickford Elementary School, if necessary, although this Court has no evidence as to the notice given for that meeting.
At the hearing on August 5, 2005, this Court received into evidence various exhibits. Plaintiff objected to admission into evidence of those exhibits that indicated efforts that the media and the PTO took to notify the public of and prepare for the May 11, 2005 meeting as irrelevant, and the Court admitted them without prejudice to a later determination as to the relevance or weight to afford them. The Court heard testimony in the plaintiff's case from plaintiff Ohs. Defendants moved for judgment as a matter of law at the close of plaintiff's case, claiming plaintiff lacks standing to bring this action under the Open Meetings Act. The Court reserved decision on that issue (and will address it on its merits in this Decision) and allowed the defendants to present evidence in their case, without prejudice to the Court later considering the standing issue. The defendants presented the testimony of defendant Halley and Ruthanne Hienerwadel, President of the Wickford Elementary School until July 2005. It also received oral argument and written memoranda from the parties.
 DISCUSSION Standing
The defendants argue that plaintiff Ohs lacks standing either as an individual, on behalf of the PTO or as a member of the general public to bring this action against them for violation of the Open Meetings Act. They contend that Ms. Ohs, whether in her capacity as an individual, a representative of the PTO or a representative of the general public, is not an "aggrieved" party, within the meaning of the Act, because she had notice that the School Committee would discuss closure of the Wickford Elementary School at its May 11, 2005 meeting, she had the opportunity to prepare for and attend that meeting, and she attended and participated in that meeting, together with large numbers of citizens.
Plaintiff Ohs counters that she was aggrieved in this case by the defendants' violation of the Open Meetings Act, not as a member of the public or individually, but in her capacity as President of the PTO. She contends that the inadequate description of the issues to be discussed in the published notice of the May 11, 2005 meeting adversely affected the ability of the PTO to notify its members, allow for the parent members to prepare for that meeting and respond to the issues raised at the meeting. She claims that the PTO could not make up for the lack of proper notice to parents of the issues to be discussed at the meeting.
Defendants respond that, if plaintiff Ohs had difficulty getting the word out about the meeting, then that is a problem with respect to the internal workings of the PTO and cannot be a basis for granting her standing in this case. According to the defendants, if she is not aggrieved within the meaning of the Act, then it necessarily follows that the PTO organization cannot be aggrieved.
In addressing these arguments, this Court must begin with an analysis of the Rhode Island Supreme Court's recent decision in Tanner v. The TownCouncil of East Greenwich et als., 2005 WL 16661340 (R.I. 2005) — a seminal decision of the Supreme Court on the issues of standing to bring suit under the Open Meetings Act, the meaning of the Act's notice provisions and its available remedies. In Tanner, the Supreme Court held that the Open Meetings Act confers upon members of the public a broad grant of statutory standing, stating:
 [a] party acquires standing either by suffering an injury in fact or as the beneficiary of express statutory authority granting standing. The OMA contains a broad grant of statutory standing. "Any citizen or entity of the state who is aggrieved as a result of violations of the provisions of this chapter may file a complaint with the attorney general," § 42-46-8(a), or "retain private counsel for the purpose of filing a complaint in the superior court . . . against the public body which has allegedly violated the provisions of this chapter."
Tanner, slip op. at 7 (quoting § 42-46-8c. In defining an "aggrieved" party under the Act, the Supreme Court opined as follows:
 On its face, the avowed purpose of the OMA is that "public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy." Section 42-46-1. The plain language of this chapter clearly demonstrates that the purpose of the OMA is to protect the public's right to participate in the political process, and not an individual's property or contract rights. Thus, the statutory requirement that an individual be "aggrieved" by a violation of the OMA does not require that a plaintiff allege some harm to his or her economic or property interests, but rather that his or her right to be "advised of and aware of" the performance, deliberations, and decisions of government entities was, or may be, violated.
Id. As to notice, the Supreme Court stated:
 plaintiff's right to be advised of the business to be conducted at the meeting does not depend on his or her having a personal stake in the substance of the meeting. Clearly, since members of the general public have a right to receive notice of public meetings, a member of the public should have standing to enforce that right. Id. (emphasis added).
The Supreme Court then acknowledged its prior decision in Graziano v.Rhode Island State Lottery Commission, 810 A.2d 215 (R.I. 2002), which held that the plaintiff, who actually attended the meeting, lacked standing to challenge the alleged inadequacy of the meeting notice because there was no showing of disadvantage or aggrievement. Yet it did not rely on its holding in Graziano to decide Tanner, choosing instead to differentiate standing based on injury in fact (upon which the Supreme Court relied in Graziano) from statutory standing (upon which the Supreme Court relied in Tanner). It thus rejected the premise in Graziano that, for standing purposes, the public has an interest under the Open Meetings Act not unlike the economic or property interests of abutters and others appearing before town councils or zoning boards that can establish injury in fact, deciding instead that the statutory standing of the public under the Open Meetings Act is much broader. The Supreme Court in Tanner,
although stopping short of expressly overruling Graziano, merely cited it for the narrow proposition that "attendance at the meeting would not prevent a showing of grievance or disadvantage, such as lack of preparation or ability to respond to the issue." Id. (quoting Graziano,810 A.2d at 222). The Supreme Court then concluded that given the plaintiff's status as a resident of East Greenwich and his allegation that the improper notice of the East Greenwich Town Council meeting resulted in his being aggrieved or disadvantaged by failing to attend the meeting or being unprepared or unable to respond to the issue during the meeting, he had standing to bring suit under the Open Meetings Act. Id.
This Court is of the view, therefore, that Tanner can be read broadly as establishing that members of the public always have standing to bring suit under the Open Meetings Act to challenge a failure of a public body to give notice of a meeting in conformance with the provisions of § 42-46-6
of the Act. Such persons are "aggrieved," within the meaning of the Act, by definition, because they claim that their statutory right to receive notice has been violated. They are "aggrieved" simply by alleging that a public body, in contravention of the express provisions of the Act, failed to ensure that its "public business be performed in an open and public manner" or that their "right to be `advised of and aware of'" the performance, deliberations, and decisions of [a public body] was, or may be, violated." Tanner, slip. op. at 7 (quoting R.I. Gen. Laws § 42-46-1).
This view of Tanner is supported by the language of Tanner itself. The Supreme Court advised that the Open Meetings Act contains "a broad grant of statutory standing." Id. It noted that "in statutory standing cases, such as this, the analysis consists of a straight statutory construction of the relevant statute to determine upon whom the Legislature conferred standing and whether the claimant in question falls in that category."Tanner, slip op. at 7, n. 6. It then cited to the United States Supreme Court decision in Linda R.S. v. Richard D., 410 U.S. 614, 617 (1973), for the proposition that the Legislature "may enact statutes creating legal rights, the invasion of which creates standing, even though no injury would exist without the statute." Id. The Supreme Court advised that "[i]n conducting this analysis, we do not look at the eventuality of success on the merits, but, rather, at whether a party is arguably within the zone of interests to be protected or regulated by the statute in question." Id. (citing Association of Data Processing ServiceOrganizations, Inc. v. Camp, 397 U.S. 150, 153-54 (1970). Following this logic, the Open Meetings Act creates legal rights for benefit of the public (such as the notice provisions of § 42-46-6), that, if violated, create standing in members of the public to enforce those rights, without regard to whether they ultimately will succeed in proving a violation; the members of the public are "aggrieved" under the Act and thus have standing simply because allege that they are the beneficiaries of the Act's protections and are thus "within the zone of interests to be protected . . . by the statute in question." Id.[3]
As such, plaintiff Ohs — individually, as a member and on behalf of the other members of the Wickford Elementary PTO and as a member of the general public — has standing as an aggrieved party to claim that the School Committee violated the notice provisions of the Open Meetings Act. By law, the School Committee had an obligation to the plaintiff and to the public generally to give notice of its meetings in accordance with the provisions of the Open Meetings Act; by alleging that the School Committee failed to do so in and thus violated "the right" of plaintiff specifically (and, by extension, the members of the public generally) "`to be advised of and aware of'" the nature of the business to be conducted at the meeting of May 11, 2005, plaintiff acquires standing to contest such a violation. Tanner, slip op. at 7 (quoting R.I. Gen. Laws § 42-46-1). "[S]ince members of the general public have a right to receive notice of public meetings, a member of the public [such as plaintiff] should have standing to enforce that right." Id., slip op. at 7.
While the defendants, in reliance on the Supreme Court's earlier decision in Graziano, seek to require the plaintiff not only to allege that the School Committee failed to meet its statutory obligation to give proper notice, but to prove that she was disadvantaged or aggrieved by the absence of notice in order to establish her standing as an "aggrieved" party in this case, this Court, for the reasons indicated above, is not convinced that such proof is required under the dictates of Tanner. In addition, while defendants, again in reliance on Graziano, argue that plaintiff cannot establish standing because she knew of the meeting in advance from means other than the statutorily required notice at issue, she had an opportunity to notify her membership and prepare for the meeting, and she as well as a large number of citizens and the media attended the meeting, to so find would eviscerate the Open Meetings Act.
The Act requires public bodies to give the public proper notice of their meetings. See R.I. Gen. Laws § 42-46-6. Its language in no way relieves the public body of that legal obligation under circumstances where the public itself or the media does the public body's job for it. Id. §§ 42-46-1 et seq. If a citizen is not allowed to challenge a failure by a public body to live up to its notice obligations under the law when the public itself or the media gives notice to the public instead, then the avowed purpose of the Open Meetings Act to ensure that "public business be performed in an open and public manner" could be thwarted,see id. § 42-46-1, and the notice provisions of the Act could be rendered meaningless; a public body could be relieved improperly of its legal obligation to give notice; that body might be encouraged to give inadequate notice or no notice at all, especially with respect to the most controversial issues, leaving that task, if accomplished at all, to the media and members of the public; and a plaintiff could be deprived of a vehicle to enjoin potential future violations of the Act.[4] For all of those reasons, therefore, plaintiff Ohs, in her capacity as President of the Wickford Elementary School PTO, must be deemed to have standing in this case to protest the notice given by the School Committee of its May 11, 2005 meeting as violative of the Open Meetings Act.
 Violation of the Open Meetings Act
Plaintiff Ohs contends that the notice published by the School Committee for its May 11, 2005 meeting violated the notice provisions of the Open Meetings Act, R.I. Gen. Laws § 42-46-6, because it listed on the agenda for that meeting "unfinished business" pertaining to the "2005-05 school budget" and failed to notify the public that the issues of school closure and consolidation would be discussed or that the issue of closure of the Wickford Elementary School would be voted upon. Plaintiff Ohs argues that the notice thus failed to include "a statement specifying the nature of the business to be discussed," in violation of the mandates of § 42-46-6 of the Act.
Dr. Halley, in defending the notice given by the School Committee for which he was responsible, argues that a description of ongoing budget discussions is sufficient to apprise the public that the issues of school closure and consolidation were on the agenda. He claims that those issues were part of his proposed budget from January 2005 forward, that an interested and informed citizenry would know that if they followed the budget discussions and attended regular School Committee meetings, and that the large public attendance at the May 11, 2005 meeting proves that the public (and the PTO) had adequate notice of the meeting and the issues that were on the agenda for discussion and decision at that meeting.
The Preamble to the Open Meetings Act heralds its fundamental purpose:
 [i]t is essential to the maintenance of a democratic society that public business be performed in an open and public manner and that the citizens be advised of and aware of the performance of public officials and the deliberations and decisions that go into the making of public policy.
Rhode Island Open Meetings Act, R.I. Gen. Laws § 42-46-1. Toward this end, the Open Meetings Act mandates that "[a]ll public bodies shall give written notice of their regularly scheduled meetings at the beginning of each calendar year," id. § 42-46-6(a), and "supplemental written public notice of any meeting within a minimum of forty-eight (48) hours before the date." Id. § 42-46-6(b). "This [supplemental] notice shall include the date the notice was posted, the date, time and place of the meeting, and a statement specifying the nature of the business to be discussed."Id. The Act requires that written public notice be posted at the principal office of the public body holding the meeting (or, if no such office exists, at the building where the meeting will be held), be posted in at least one other prominent place within the governmental unit, and be electronically filed with the Secretary of State. Id. § 42-46-6(c).
Mindful of the public's high level of interest in local education and the operations of their local public schools, and presumably in response to past citizen complaints of inadequate notice of school committee meetings and the agenda for such meetings, the Act also has been amended over time to contain specific provisions regarding school committee meetings. The Act, for example, requires written notice of all school committee meetings to be published in a newspaper of general circulation in the school district that is under the school committee's jurisdiction. Id. In addition, the Act forbids a school committee from adding items to its agenda that were not contained within its published notice of the meeting unless they were "unexpected and could not have been added in time for newspaper notice." Id. § 42-46-6(d). In that event, the school committee must make a finding for the record at its meeting as to "why the agenda items could not have been added in time for such publication." Id. § 42-46-6(d)(2)(3). At a minimum, however, the school committee still must give the public 48-hour advance written notice of the new agenda items for the meeting in accordance with the standard notice requirements of the Act other than publication (i.e.,
posting in the two public locations specified and electronic filing with the Secretary of State), as well as through notice posted on the School District's website, and the public must be aware of the process for late notice of new unexpected agenda items. Id. § 42-46-6(d)(1), (4).
The Rhode Island Supreme Court, only three days before the filing of plaintiff's complaint in this action, had occasion to consider the issue of what constitutes adequate notice under the Open Meetings Act. InTanner v. The Town Council of East Greenwich et als., 2005 WL 16661340 (R.I. 2005), the Supreme Court sought to parse the Act to determine the intent of the Legislature in requiring a public body, pursuant to R.I. Gen. Laws § 42-46-6(b), to give notice of its meeting to include a "statement specifying the nature of the business to be discussed."Tanner, slip op. at 8-10. It acknowledged that "[t]he Legislature did not explicitly specify or delineate the exact requirements of this `statement.'" Id. at 8. The Supreme Court then went on to hold:
 that the requirement that a public body provide supplemental notice, including a "statement specifying the nature of the business to be discussed," obligates that public body to provide fair notice to the public under the circumstances, or such notice based on the totality of the circumstances as would fairly inform the public of the nature of the business to be discussed or acted upon.
Id. at 9. The Court acknowledged that this is a "flexible" standard designed to account for "the range and assortment of meetings, votes and actions covered under the [Open Meetings Act], and the realities of local government, while also safeguarding the public's interest in knowing and observing the workings of its governmental bodies." Id. It then cautioned that the notice should be such "that the citizens, or the Attorney General, will not be compelled to resort to the courts to assure that a public body has complied with its statutory duty." Id.
In Tanner, the Court found violative of the Open Meetings Act a notice issued by the East Greenwich Town Council for a meeting at which it would consider, as the only item of business on its agenda, interviews for potential board and commission appointments where the Town Council not only proceeded to interview the candidates but in fact voted on those appointments. Id.
at 10. The Court determined that such notice was misleading and failed to provide the public with fair notice, in advance, of the action it ultimately took.Id.
Similarly, in an advisory opinion issued by the Attorney General in Payne v. Town of New Shoreham TownCouncil, Unofficial Finding No.: OM 97-17 (Sept. 8, 1997) — which may be instructive but, under Tanner, id., may not be entitled to deference by this Court — the Attorney General found that notice advertising a Town Council meeting agenda item concerning the Comprehensive Plan did not adequately apprise the public that the issue of a jitney service would be discussed. It found that notice to be in violation of the notice provisions of the Open Meetings Act.
In this case, notwithstanding Dr. Halley's protestations to the contrary, it cannot seriously be questioned that the notice given by the School Committee of its May 11, 2005 meeting was wholly inadequate in describing the nature of the business to be discussed at the meeting. The purpose of that meeting, as indicated by the minutes of the meeting of April 13, 2005 (when the School Committee voted to rescind the 7 school budget and return to the 6 school budget originally presented as an alternative budget by Dr. Halley in January 2005) and the minutes of the meeting of April 27, 2005 (when the School Committee decided to postpone a vote on the closure of the Wickford Elementary School until the next meeting), was to further discuss school closure and consolidation, reconfiguration and pairing of the remaining 6 elementary schools in the district and to vote on the issue of the closure of the Wickford Elementary School. School closure and consolidation, therefore, are not the two distinct issues (even though they may be reflected in separate line items in a budget) that Dr. Halley, in his hearing testimony, wanted this Court to believe them to be. School closure, as outlined in his original yellow budget, is the necessary precursor to consolidation (which, by definition, presupposes 6 schools). It is hard to give notice of one, therefore, without the other.
Indeed, it is hard to conceive of issues more critical to the future of education in the North Kingstown School District or more capable of generating a high degree of public interest. Indeed, a School Committee is forbidden by Rhode Island law from closing a school without good cause. R.I. Gen. Laws § 16-2-15.
Yet the published "Agenda" for the May 11, 2005 School Committee meeting gave a description of the business to be discussed that did nothing to inform the public that the issues of school closure or consolidation, reconfiguration and pairing would be discussed or a vote would be taken on whether to close the Wickford Elementary School. It merely indicated a continuation of discussions regarding the school budget for the next fiscal year without highlighting the issues of school closure and consolidation that were so critical, in the eyes of the School Committee, to the success or failure of the budget and of such profound interest to the public. At the meeting itself, though, the School Committee discussed both issues of school closure and consolidation — a point on which Dr. Halley gave conflicting testimony — and then voted to close Wickford Elementary School.
Dr. Halley attempted to suggest that putting the school budget on the agenda is sufficient to notify the public that school closure and consolidation will be discussed (and perhaps voted upon) because each of those issues were addressed in his yellow budget, and a concerned citizen with a will to be educated and informed could obtain a copy of the budget and his presentation connected with it from the School Department or its website. He also attempted to suggest that school closure does not fit in the same category as consolidation such that it need not be mentioned at all in the notice. The defendants argued, as they did with respect to the issue of plaintiff's standing, that this notice must be deemed fair to the public because over a hundred citizens turned out for the May 11, 2005 meeting and the media publicized the upcoming school closure vote extensively before the meeting. This Court disagrees.
Just like the notice in Tanner that failed to alert the public as to an upcoming vote of the Town Council, and similar to the notice in the Payne advisory opinion of the Attorney General advertising discussion of the Comprehensive Plan that failed to give fair notice of action on a proposal regarding a jitney service for public transportation (even where the Comprehensive Plan heading was used by many others inside and outside the government to refer to the jitney service proposal), the notice of the May 11, 2005 meeting fails to give fair notice to the public that the School Committee, within its broader budget discussions, will be discussing issues of school closure and consolidation and voting on Wickford Elementary School closure. The issue of consolidation of elementary schools, in the words of Dr. Halley himself, is complex and deserving of mention in the agenda separate and apart from a generalized reference to the budget. The issue of school closure, generally, and the closure of the Wickford Elementary School and a vote thereon, in particular, is no less deserving. Indeed, as noted, school closure is a necessary predicate to consolidation and the discussion of one cannot be held in a vacuum separate and apart from the other.
Moreover, Dr. Halley's defense of his notice of the May 11, 2005 meeting as not improperly omitting a reference to consolidation is belied by his own notices and the history of the School Committee's budget discussions. Dr. Halley put consolidation on his notices of upcoming School Committee meetings when it suited his purposes. Regardless of whether consolidation was included on the agenda, school closure and consolidation came up at virtually every School Committee meeting.
He put consolidation on the agenda for the meeting of January 31, 2005 when the yellow budget (closure of Wickford Elementary School; consolidation of 6 remaining elementary schools) was first discussed, for the meeting of February 9, 2005 when the School Committee voted to ask him for another budget with 7 schools, for the meeting of February 17, 2005 at which the School Committee voted to keep 7 schools and approve a budget amount for them, for the meetings of February 23, 2005 and March 3, 2005 and for the meeting of May 18, 2005 that followed the May 11, 2005 meeting at issue, after which the School Committee had voted to close the Wickford Elementary School. In fact, as to the latter meeting, and perhaps mindful of complaints from the public about lack of notice, he broadened the description of the meeting beyond the notice given for any prior meeting to include: "2005-06 School Budget: Consolidation of 6 Elementary Schools."
He failed to highlight the issue of consolidation on the meeting notices, however, for the meeting of February 2, 2005 (when he listed school closure and consolidation as possible budget cuts at a work session that followed the first meeting advertising consolidation at which he advocated the 7 school budget as the best educationally), the meeting of February 16, 2005 (the large public meeting where the School Committee set the stage for a vote the following evening to keep 7 schools), and the four meetings preceding the school closure vote of May 11, 2005 (inclusive of the meetings of March 9, 2005, March 23, 2005, April 13, 2005 and April 27, 2005).
If the issue of consolidation were not important to put on the agenda, then there is no explanation for listing it so many times as an agenda item. If it were simply an oversight not to list it as an agenda item so many times, then there is no explanation for why he failed to include it on the agendas of meetings that were critically important for obtaining public input and defining for the public the School Committee's stance on the issues of school closure and consolidation.
In addition, as in Tanner, the agenda that the School Committee did publish for the May 11, 2005 meeting is not only inadequate and incomplete, but misleading. By listing the business to be discussed at the upcoming meeting as "unfinished" and omitting any reference to consolidation or school closure or a vote to close the Wickford Elementary School, members of the public might well have assumed that the same 7 school budget that the School Committee had first decided upon in February (when it took the 6 school yellow budget off the table) was still on the table. After all, no mention of consolidation or school closure was made in any agenda for any School Committee meeting from the meeting of April 13, 2005 (at which the School Committee rescinded the 7 school budget and put the issues of school closure and consolidation back into play) forward, inclusive of the agendas for the meeting of April 27, 2005 (at which it considered and would have voted on the issue of closure of Wickford Elementary School but for a desire for greater public notice and participation) and the agenda for the meeting of May 11, 2005 at issue.
While Dr. Halley attempted to suggest that he used the phrase "unfinished business" simply to denote that the same budget discussion was ongoing for months, his testimony in that regard is contradicted by his own meeting notices. On several occasions, he changed the description of the meeting from unfinished to new budget business (January 31, 2005, February 9, 17 and 23, 2005, and March 3, 2005). Yet in the critical time period leading up to and including the May 11, 2005 meeting, when it would have been most prudent and informative to refer to the business as "new" rather than "unfinished," he simply reverted to the "unfinished" terminology.
The notice for the May 11, 2005 meeting also was inadequate and misleading because it did not advertise the fact that the School Committee would vote at the meeting on the issue of whether to close the Wickford Elementary School. While the Supreme Court recognized inTanner that "the [Open Meetings Act] does not explicitly require a public body to identify on the notice that it intends to vote on an issue at the meeting," it likewise recognized that such an obligation exists where the absence of that information would be misleading or fail to inform the public, under all of the circumstances, of the business at hand. Tanner, slip op. at 9. Here, the notice is misleading in that regard because the School Committee knew how to list and in fact in the past had listed on a meeting agenda that "action" was to be taken. See Agenda for Meeting of February 16, 2005 (when it had been anticipated that the School Committee would vote on budgeting for 7 schools — a vote that it postponed and then took the following evening). More importantly, the School Committee failed to notify the public of the upcoming May 11, 2005 vote to close Wickford Elementary School — a vote of extreme importance to the budget process, the next step of consolidation and the public — even after it had voted on April 27, 2005 to schedule that vote for May 11, 2005 precisely because it wanted to give the public more notice.
The School Committee knew on April 13, 2005, when it voted to rescind the 7 school budget and put the issues of school closure and consolidation that it had taken off the table in February 2005 back on the table, that it was critical to involve the public, once again, in the process. Indeed there was discussion between the School Committee and the public at that meeting as to the need for greater public education on the new issues and participation in the process. Notwithstanding those expressed concerns, the "Agenda" for the April 27, 2005 meeting (just like the "Agenda" for the May 11, 2005 meeting at issue here) failed to mention school closure or consolidation or any "new" school budget business at all. It did not indicate that any action would be taken at the April 27, 2005 meeting to pave the way for reconfiguration and consolidation of the School District, even though Dr. Halley fully anticipated, at the time he gave the notice, that the school closure issue would be discussed (through his PowerPoint presentation) and voted upon. See Halley Hearing Testimony. There was further discussion about the need for public input at the meeting on April 27, 2005 when Dr. Halley was asked if he had shared his PowerPoint presentation on closure of the Wickford Elementary School with the PTOs (he had not) and when the vote that he had anticipated that the School Committee would take that night to approve the closure was postponed until the May 11, 2005 meeting.
In light of this chain of events, the omission of any notice to the public in the "Agenda" of May 11, 2005 of school closure or consolidation and a vote to close Wickford Elementary School seems not only deficient but egregious. The School Committee should have made sure that public notice was adequate under these circumstances because it was its long budget process that came full circle without sufficient notice to the public that created much of the public outcry. How a public body makes a decision is often as important, or more important, than the decision itself.
For the defendants to argue that the PTO in this case seeks to blame them for its own internal organizational problems in getting notice out to the public, and for the defendants to argue "no harm, no foul" from their failure to give legally required notice because the public worked to spread the word and the media gave notice for them, is simply wrong. If there was a failure on the part of the School Committee to give the public the notice that the law requires it to give, the responsibility for that failure rests exclusively at the feet of the School Committee. In this Court's view:
 In giving notice to the public under the Open Meetings Act, a public official should not ask "what is the minimal amount of notice I can get away with?" but "what is the best notice I can give to fairly inform the public of the workings of its government?"
Based on "the totality of circumstances," therefore, this Court finds that the School Committee failed to give notice to the public of its May 11, 2005 meeting "as would fairly inform the public of the nature of the business to be discussed or acted upon." Id. The published "Agenda" for that meeting failed to give the public notice that the School Committee would discuss issues of school closure and consolidation and that it would vote upon the issue of closure of the Wickford Elementary School. It is thus declared by this Court that the "Agenda" for the May 11, 2005 School Committee meeting published by the School Committee violated § 42-46-6
of the Open Meetings Act.
 Injunctive Relief
The Open Meetings Act provides that if a Court determines that a public body has violated the Act, it "may issue injunctive relief and declare null and void any actions of a public body found to be in violation of the chapter." R.I. Gen. Laws § 42-46-8(d). The Court also "shall award attorneys' fees and costs to a prevailing party except where special circumstances would render an award unjust." Id. In addition, the Court may impose a civil fine not exceeding $5000 against a public body or any of its members found to have committed a willing or knowing violation of this chapter. Id.
The issue of whether there has been a willful violation of the Act by any of the defendants, and plaintiff's related request for imposition of a civil fine, by agreement of the parties and the Court, has been bifurcated and will be heard, if necessary, at a later date. As the issue of the amount of attorney's fees to be awarded, likewise, can be affected by a determination of willfulness, see Tanner, slip op. at 12, that issue, too, will be heard at a later date.[5]
In fashioning a remedy for the defendants' violation of the Open Meetings Act, therefore, the only issue at this juncture is whether plaintiff is entitled to injunctive relief.
Plaintiff seeks to have this Court declare the vote of the School Committee on May 11, 2005 null and void. She also asks that the School Committee be enjoined from taking any action to implement that vote closing Wickford Elementary School, inclusive of action to implement consolidation and reconfiguration of the other elementary schools. She argues that such relief is supported by proof of her success on the merits, the balance of the equities in her favor and irreparable harm that would result to her in the absence of that relief.
The defendants have defended this case principally by arguing that plaintiff lacks standing to bring this suit under the Open Meetings Act and also by contending that the notice she and other members of the public had of the meeting through media coverage and word of mouth and their ability to prepare for and participate in the meeting proves that no violation of the Act occurred. In other words, they have attacked plaintiff's case on the merits of her claim of violation of the Act. Defendants have presented no evidence or argument on the issue of injunctive relief.
For purpose of deciding the injunctive relief issue, the Court first inquires as to plaintiff's success or likelihood of success on the merits. It also must examine whether plaintiff will suffer irreparable harm or has an adequate remedy at law and whether the balance of the equities, including the public interest, as between the parties, favors plaintiff. See FrenchtownFive, LLC v. Vanikiotis, 863 A.2d 1279, 1282 (R.I. 2004); Morrill v. Weaver 224 F. Supp. 2d 882, 893
(E.D.Pa. 2002).
It goes without saying that plaintiff has prevailed on the merits of her claim for declaratory relief in that this Court has declared the defendants to be in violation of the notice provisions of the Open Meetings Act. Her success on the merits is a strong factor militating in favor of injunctive relief, as the Act allows the Court to declare the vote at issue null and void and award injunctive relief under such circumstances.
Moreover, to not declare the vote that is the subject of illegal notice null and void would seem to undercut the value of this Court's declaration of violation of the Open Meetings Act. Such a profound public right as receiving notice of public meetings and the actions and decisions of government should not be without such a corresponding remedy. Otherwise, the right could be cast aside more easily and the very purpose of the Act — to ensure that the public's business be performed in an open and public manner — could be gravely undermined. The public must not only have an open government with full knowledge of its workings and the right to participate in its political processes, but the public also must believe that it has such a right and that its public officials will protect it.
Nullifying a vote that is infected by a violation of the statutory requirements of notice to the public is essential to ensuring the integrity of the political process. It is essential to maintaining the public's confidence in its government. Those are interests, that if not protected, can be harmed irreparably, and for which there is no other adequate remedy at law.
Furthermore, the balance of equities between the parties favors such nullification of the vote and the corresponding injunctive relief requested by the plaintiff. The defendants have already put implementation of the vote on hold through the consent order regarding temporary injunctive relief. They have offered no evidence that a slightly longer delay in implementation that would be occasioned by a nullification of the May 11, 2005 vote and a re-vote after proper notice would cause any harm, regardless of the eventual outcome. The School Committee members would be free to vote again, after proper notice to the public, in the same way that they voted before — up or down — subject obviously to further consideration, if appropriate, of new public comment and any other new information, financial or otherwise, that they might receive. There has been no showing that the fact of re-vote itself would favor the plaintiff PTO members' positions or hurt the defendants' positions as to the merits of school closure or consolidation in any way.
This seems like a rather minor burden to impose on the School Committee for its violation of the Open Meetings Act. Yet the cost to the plaintiff PTO members and members of the public could be great if this Court were not to nullify the May 11, 2005 vote and enjoin further action with respect to it. The violation of the Open Meetings Act that this Court has declared would be trivialized. The people's confidence in their public officials and in the votes of those officials last spring would be much less than if a re-vote were taken after proper notice in conformance with the Act. Both the defendants and the plaintiff PTO should want no less.
Accordingly, this Court grants plaintiff's request for declaratory and injunctive relief and orders nullification of the vote of May 11, 2005 by the School Committee to close the Wickford Elementary School and further orders corresponding injunctive relief, to enjoin implementation of that vote, pending a new vote, after proper notice to the public as required by this Decision and the Open Meetings Act. It may well be that a more open and educated process may result in a better decision, or at least one in which the parties have greater confidence, even if that decision is one with which they do not agree.
 ORDER
For all of the reasons set forth in its Decision dated August 10, 2005, this Court hereby grants plaintiff Ohs her requested declaratory and injunctive relief and orders the following:
 1. The May 11, 2005 meeting notice of the North Kingstown School Committee published by the School Committee is declared to be in violation of the notice provisions of the Open Meetings Act, R.I. Gen. Laws § 42-46-6.
 2. The May 11, 2005 vote of the School Committee to close the Wickford Elementary School is declared null and void.
 3. The defendants are enjoined from taking any action to close the Wickford Elementary School and from taking any action to implement its prior May 11, 2005 closure vote (including, but not limited to, actions to consolidate or reconfigure or modify other schools in the district to accommodate additional students as a result of the school closure), pending further vote on the issue of closure of the Wickford Elementary School after full and fair notice to the public, in conformance with the dictates of the Open Meetings Act and this Decision, that the issues of school closure and consolidation will be discussed and the closure of the Wickford Elementary School will be voted upon.
 4. Written notice of all meetings of the School Committee must be given, at least 48 hours in advance, by defendants' counsel to plaintiff's counsel, in a manner to be agreed upon by and between counsel forthwith, that ensures timely receipt of notice by the parties.
 5. Plaintiff's remaining claims in the case for attorney's fees and a civil penalty will be the subject of a status conference among all counsel of record before me on September 9, 2005.
[1] It appears that the School Committee met jointly with the Town Council on March 2, 2005 regarding the FY 06 School Budget (based on a copy of the Agenda for that meeting that the parties included in Joint Exhibit A and reference to it during the next School Committee meeting on March 3, 2005), although the absence from the record of any minutes for that meeting precludes this Court from knowing the precise substance of that meeting.
[2] These comments, according to the Minutes, are appended to the Minutes as Appendix A. Appendix A, however, is not attached to the Minutes that the parties submitted to the Court as a Joint Exhibit.
[3] Further support for this proposition can be found in footnote 7 ofTanner in which the Supreme Court quoted Solas v. Emergency HiringCouncil, 774 A.2d 820, 823 (R.I. 2001), for its holding that a "plaintiff has statutory standing to raise the issue of potential future violations of the [Open Meetings Act]." Tanner, slip. op. at 7 n. 7. If a member of the public has standing to raise the issue of potential future violations of the Open Meetings Act that, by definition, have not yet occurred, then it necessarily follows that such a person would have standing to contest any current violation of the Act that the Legislature intended to enact for the public's benefit.
[4] Moreover, even if plaintiff, as a representative of the PTO, is required to make a more specific showing of disadvantage or aggrievement (such as lack of preparation or ability to respond to the issue) to establish standing, she can make such a showing. The PTO could not rely on the statutory notice to apprise its membership of the nature of the upcoming May 11, 2005 meeting, as the notice did not mention school closure or consolidation. It also was hampered by the notice in its own ability to notify its membership about the content of the meeting, as it could not give notice on the Listserve and in the backpacks of any greater notice than the School Committee itself had given. The PTO and its members were further at a disadvantage in preparing for the meeting at issue (even assuming that its members knew about the nature of the meeting from other citizens or the media) because of the history of inadequate meeting notices given by the School Committee during the course of its budget process. Although the School Committee had apparently come full circle on the issues of Wickford Elementary School closure and consolidation, reconfiguration and pairing of the other elementary schools in the district over the course of many weeks and months of meetings, members of the public and, by extension, members of the Wickford Elementary School PTO had largely left off with the discussion in February when the School Committee voted to take the issues of school closure and consolidation off the table. The absence of notice of meetings regarding school closure and consolidation all the way along, therefore, meant that even when the public did get notice from the media and other citizens of the meetings of April 27, 2005 and May 11, 2005, when school closure and consolidation were back on the table, those notices were infected by the earlier improper notices and adversely affected the public's right to know, understand and participate in the decision-making proceedings of its School Committee.
[5] A status conference regarding these issues will be scheduled with the Court on September 9, 2005.